[No. 36781. Department Two. April 23, 1964.]

R. B. ROBBINS *et al., Appellants,* v. HUNTS FOOD & INDUSTRIES, INC., *Respondent.*\*

\*Reported in 391 P. (2d) 713.

*Jones, Grey, Kehoe, Hooper & Olsen, Albert Olsen,* and *Russell J. Reid,* for appellants.

*Holman, Marion, Black, Perkins & Coie, J. Paul Coie,* and *David E. Wagoner,* for respondent.

HAMILTON, J.—This appeal involves an action for the alleged termination and breach of a corporate stock purchase agreement. From a judgment of dismissal, plaintiffs appeal.

The factual background giving rise to this action commenced on September 21, 1955, when North-Robbins Plywood Sales, Inc. (hereafter referred to as Sales Company), wholly owned by plaintiffs, entered into a sales agreement with Stevenson Co-Ply, Inc. (hereafter referred to as Co-Ply), a worker-owned and operated plywood manufacturing company. Under the terms of this agreement, Sales Company was to be the "exclusive sales agent" for Co-Ply for a period of 10 years from and after the date on which Co-Ply commenced plywood and veneer production at facilities to be acquired in Stevenson, Washington. Production commenced in early February, 1956.

Shortly after Co-Ply went into production, representatives of Harbor Plywood Corporation, defendant's predecessor[1] (hereafter referred to as Harbor), communicated to plaintiffs a desire to acquire the right to purchase and distribute Co-Ply's production. Negotiations ensued, resulting in a proposal that Harbor purchase from plaintiffs all issued and outstanding stock of Sales Company, provided Sales Company and Co-Ply executed an agreement, designated as an Amended Agreement, superseding the original sales agreement. Among other changes, the amended agreement gave Sales Company, in lieu of the "exclusive sales" agency, an "exclusive preferential right to buy . . . all

[1]Subsequent to commencement of this action, Harbor Plywood Corporation was merged into Hunts Food & Industries, Inc., and the latter corporation substituted as defendant.

or any part of the plywood, veneers and lumber . . . produced" by Co-Ply, at the prevailing net prices adhered to by certain designated manufacturers. Any disputes in pricing were to be settled by arbitration and without interruption in delivery of products. The amended agreement, between Sales Company and Co-Ply, and the stock purchase agreement, between plaintiffs and Harbor, were executed on June 11, 1956.

Under the terms of the stock purchase agreement, Harbor agreed to pay to plaintiffs the net value of the assets of Sales Company, subsequently fixed at $94,000, and additional quarterly payments, to an aggregate of $500,000, measured by 2 per cent of all subsequent purchases of plywood and other products from Co-Ply under the amended agreement. Plaintiffs, as sellers, agreed:

" . . . If Co-Ply or any successor of Co-Ply . . . shall refuse to sell and deliver such mill's production to Sales Company under the Amended Agreement . . . whether such failure or refusal is or is not a breach of the Amended Agreement, Harbor shall not be obligated to make any Additional Payments to Sellers with respect to the production of said Stevenson mill not actually sold and delivered to Harbor nor shall Harbor or Sales Company be obligated to institute or enter into litigation to enforce the rights of Sales Company under said Amended Agreement. . . ."

And, Harbor agreed:

" . . . it will not voluntarily consent or agree to a cancellation or termination of said Amended Agreement . . . prior to the expiration of the term of said agreement; provided, that this shall not be construed as preventing Harbor from electing not to take from time to time all or part of Co-Ply's production as provided in said Amended Agreement . . ."

The amended agreement, among other provisions, provided:

" . . . Sales Company may not assign this agreement without the prior written consent of Co-Ply (which consent shall not unreasonably be withheld), except that in the event of the merger or consolidation of Sales Company with or into another corporation or in the event of liquidation

of Sales Company this agreement may, without Co-Ply's consent, be assigned to the corporation into or with which Sales Company is merged, consolidated or liquidated or to the party succeeding Sales Company's interests as a result of such liquidation, in which case the successor to Sales Company shall succeed to all of Sales Company's rights and be bound by all its obligations hereunder.

"Subject to the foregoing this agreement shall be binding upon and enure to the benefit of the parties hereto and their respective successors and assigns."

Harbor, as was contemplated by the parties, merged Sales Company into itself, thus succeeding to all of Sales Company's rights and obligations under the amended agreement.

For approximately four years following execution of the agreements, the arrangement worked out satisfactorily for all parties concerned. During this period, Harbor purchased practically all of Co-Ply's production, lent financial assistance to Co-Ply on winter-log inventories in 1959, and paid to plaintiffs the base price of $94,000 plus approximately $197,323 in additional payments.

In 1960, depression struck the plywood industry. Prices dropped. Production in various mills was curtailed. Co-Ply, being worker owned, continued production. Harbor decided to discontinue its plywood business and, on May 6, 1960, sold its inventory, manufacturing facilities, and some 18 distribution warehouses to Aberdeen Plywood and Veneers, Inc. (hereafter referred to as Aberdeen). Many of Harbor's operational personnel were retained by Aberdeen. The stock purchase agreement and the amended agreement were assigned by Harbor to Aberdeen. Co-Ply was not notified of the assignment of the amended agreement until several days after the transaction.

Between May, 1960, and February, 1961, a number of meetings were held variously attended by representatives of plaintiffs, Harbor, Aberdeen, and Co-Ply. Correspondence was exchanged. Discussion centered about consent of Co-Ply to the assignment of the amended agreement. At first, it was indicated that Co-Ply's consent would be withheld, without prejudice to its rights, pending a trial period in relations between Aberdeen and Co-Ply. Later, it was

indicated that Co-Ply, as a condition to consent, was desirous of contractual changes specifying the percentage of production Aberdeen would purchase, authorizing plaintiffs to handle Co-Ply's remaining production, and obligating Aberdeen to lend financial assistance to Co-Ply when required.

During the interim market conditions remained uncertain. Aberdeen, with notice that Co-Ply was reserving its rights, purchased about one half of Co-Ply's production, lent its credit to Co-Ply to assist in financing the 1960-61 winter-log inventory, and remitted to plaintiffs in additional payments approximately $26,587.13, covering the quarterly periods from April 1, 1960, to March 31, 1961. Plaintiffs accepted the payments without reservation. Co-Ply sold such portions of its production as was not purchased by Aberdeen to other buyers.

In January, 1961, Aberdeen requested a 3 per cent functional discount upon its purchases, asserting that such discount, because of the depressed market, had become an industry practice and reflected the prevailing net price under the terms of the amended agreement. Co-Ply disagreed. Aberdeen offered to conditionally pay the 3 per cent pending settlement of the dispute. Co-Ply refused, and since the latter part of February, 1961, has sold its production to others, declining to sell any part thereof to Aberdeen. Harbor disclaims any intent or obligation to make further purchases from Co-Ply. Payments to plaintiffs ceased.

Plaintiffs initiated this suit against Harbor, contending that, by selling its plywood business and assigning the amended agreement to Aberdeen without Co-Ply's prior consent, Harbor voluntarily consented to a termination of the amended agreement contrary to the provisions of the stock purchase agreement.

In the trial court and on appeal, the crucial issue presented is the validity and effectiveness of Harbor's assignment of the amended agreement to Aberdeen.

Plaintiffs contend the amended agreement to be nonassignable without Co-Ply's express consent, thus rendering the questioned assignment ineffectual, because (a) the rela-

tionship between Co-Ply and Harbor, under the amended agreement, is such as to imply a nondelegable and continuing duty and obligation upon Harbor to purchase products from Co-Ply; (b) the amended agreement is predicated upon Harbor's business skill, judgment, and credit; and (c), in any event, the amended agreement by its terms prohibits assignment by Harbor without Co-Ply's consent, which Co-Ply did not in fact give. Defendant, on the other hand, asserts that the amended agreement, by its terms and the intent to be derived therefrom, is assignable and that Co-Ply has unreasonably withheld its consent.

The rules generally applicable to a determination of the issue of assignability of an executory contract are stated in *King v. West Coast Grocery Co.,* 72 Wash. 132, 136, 129 Pac. 1081:

" . . . There can be no question as to the general rule that, in the absence of prohibition by statute or stipulation by contract, rights arising out of executory contracts are assignable whenever they would survive to the personal representative of the assignor. 2 Am. & Eng. Ency. Law (2d ed.), 1017, 1035; *Slauson v. Schwabacher Bros. & Co.,* 4 Wash. 783, 31 Pac. 329, 31 Am. St. 948; *Conaway v. Co-Operative Homebuilders,* 65 Wash. 39, 117 Pac. 716. The exceptions to this general rule are also well established: It is often broadly stated, in varying forms of expression, that, if the rights are coupled with liabilities or if they involve a relation of personal confidence or a personal service, they cannot be assigned. 4 Cyc. 22. The difficulty is not one of mere definition. It lies in the application of these general principles to the given case. Strictly speaking, almost every right arising under an executory contract has its corresponding liability. To give to the language of the first branch of the exception an absolute sense would be to declare every executory contract nonassignable. As applied to sales of personal property for future delivery, the liability, coupled with the right, must be dependent upon some future dealing with the property sold as between the parties, in order to render the contract of sale nonassignable.

" 'When the contract is executory in its nature, and an assignee or personal representative can fairly and sufficiently execute all that the original contractor could have done, the assignee or representative may do so and have

the benefit of the contract.' *Devlin v. Mayor etc. of New York,* 63 N. Y. 8, 17.

"See, also, *In re Niagara Radiator Co.,* 164 Fed. 102.

"The question in each case must turn upon the intention of the parties. In order to determine whether a given contract falls within either branch of the exception, it is necessary to consider the nature and purpose of the contract and its terms and provisions. . . ."

■ We cannot agree with plaintiffs' assertion that the stock purchase agreement and the amended agreement, by their terms or by their nature and purpose, reflect an intent that Harbor's right, derived from Sales Company, to "buy from Co-Ply, all or any part" of Co-Ply's production carried with it by implication a *nondelegable* duty, obligation, or liability on the part of Harbor to continue to purchase so much of Co-Ply's production as could be resold. Neither can we agree that execution of the amended agreement is shown by the evidence to be bottomed upon the business and financial skill, judgment, and credit of Harbor, to the extent as would render it nonassignable. We reach these conclusions for the following reasons:

(1) The parties to the amended agreement, by its provisions with respect to assignment, comprehended and conceived that the agreement could and possibly would be assigned. They specifically provided that it could be assigned from Sales Company to Harbor. They recognized and permitted assignment by Harbor with Co-Ply's consent, and stipulated that such consent should not be unreasonably withheld. They specified that the agreement would be binding upon and enure to the benefit of their respective successors and assigns.

(2) Under the terms of the amended agreement, Harbor did not acquire the status of or become a "sales agent" for Co-Ply products.

(3) The amended agreement does not constitute, in the generally recognized sense, an "output and requirement" contract. Harbor did not contract to purchase all of Co-Ply's output, and Co-Ply did not undertake to furnish all of Harbor's requirements. Both reserved rights relative to

the production, Harbor to elect how much it would buy and Co-Ply to sell uncommitted portions to other buyers. Both operated in competitive fields. Harbor's requirements were not unusual in its business, and Co-Ply's production was not peculiar to its milling operation.

(4) A competent and comparable assignee of Harbor could as readily carry out such obligations as were imposed by the amended agreement.

We conclude that the rights and duties acquired by Harbor under the terms of the amended agreement were respectively assignable and delegable.

The final and decisive issue presented upon the question of the effectiveness and validity of Harbor's assignment of the amended agreement is whether Co-Ply's express consent thereto was required. The amended agreement in this respect, in pertinent part, provided:

" . . . Sales Company [merged into Harbor] may not assign this agreement without the prior written consent of Co-Ply (which consent shall not unreasonably be withheld), . . ."

■ We have accepted and approved judicial reasoning which interprets a similarly qualified assignment-consent provision as having the effect of relieving the assignor of the consent requirement in the event of an unreasonable refusal of consent. *Hedgecock v. Mendel,* 146 Wash. 404, 263 Pac. 593. We see no reason to reject such an interpretation in this case.

Accordingly, Harbor's assignment of the amended agreement could become effective in one of two ways: (a) By Co-Ply giving its consent, or (b) by Co-Ply unreasonably withholding its consent. Co-Ply having withheld its consent, the basic inquiry then is whether its action, under the circumstances, was unreasonable.

■ The question of the reasonableness or unreasonableness of Co-Ply's action in withholding its consent is essentially one of fact. It is to be measured by the action which would be taken by a reasonable man in like circumstances. Reason, fairness, and good faith must be the guide. Whim, caprice, or opportunism, however expedient the end, will

not suffice. *Broad & Branford Place Corp. v. J. J. Hockenjos Co.*, 132 N.J.L. 229, 39 A. (2d) 80.

In the instant case, the trial judge, in passing upon this issue, stated in his oral opinion:

"I am satisfied the evidence preponderates, more than preponderates, in favor of the proposition that the mill had no reasonable basis to withhold consent. That they were not withholding it for a reasonable, legitimate purpose, they were withholding it because they were using it as a lever to get provisions in a modification agreement they were not entitled to get as a condition to an assignment. . . ."

Thereafter, the trial judge entered findings of fact wherein he, in essence, found (a) Harbor's decision to sell and assign its facilities and contracts to Aberdeen was made in good faith and not as a means of avoiding its obligations; (b) Aberdeen was a competent, qualified, and financially sound successor to Harbor and took over all of Harbor's distribution facilities, employed most of Harbor's personnel, and continued Harbor's operations; (c) Aberdeen's inability to purchase all of Co-Ply's production was occasioned by weaknesses in Co-Ply's policies and the depressed market conditions then prevailing; (d) Co-Ply unreasonably withheld its consent to the assignment; and (e) Co-Ply has, since the early part of 1961, refused to sell and deliver any of its production to Aberdeen at the prevailing net price at which plywood manufacturers have been selling to jobbers.

The foregoing findings are supported by substantial evidence. We will not disturb them. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn. (2d) 570, 343 P. (2d) 183. The findings, in turn, support the trial court's conclusion that the questioned assignment was effective, and that Harbor did not voluntarily consent or agree to a termination of the amended agreement in violation of the stock purchase agreement.

The judgment of dismissal is affirmed.

OTT, C. J., DONWORTH, FINLEY, and WEAVER, JJ., concur.