[No. 61419-3-I.   Division One.   October 20, 2008.]

ROBERT CARLILE ET AL., *Appellants*, v. HARBOUR HOMES, INC., *Respondent*.

198

*Robert J. Curran* and *Britenae M.C. Pierce* (of *Ryan Swanson & Cleveland, PLLC*), for appellants.

*Lori K. McKown* and *Mark F. O'Donnell* (of *Preg O'Donnell & Gillett, PLLC*), for respondent.

¶1 Cox, J. — At issue in this case is whether 10 sets of subsequent homeowners may sue the developer of residential property for breach of the implied warranty of habitability, misrepresentation, breach of contract, and Consumer Protection Act (CPA), chapter 19.86 RCW, violations. Notwithstanding the assignments of claims from the original purchasers to these homeowners, we hold they cannot sue the developer for breach of the implied warranty of habitability. The economic loss rule bars both the negligent and the intentional misrepresentation claims asserted here. The claims based on breach of the duty of good faith and fair dealing are not substantiated in this record. But there are genuine issues of material fact whether the developer's acts were the cause of the claimed damages under the CPA. We affirm in part, reverse in part, and remand.

¶2 This case arises from alleged construction defects in the Harbour Homes, Inc., Bluegrass Meadows development in Snohomish County. Harbour Homes built the homes at issue between 2000 and 2003. In August 2007, 37 plaintiffs sued Harbour Homes, alleging that their homes contained

construction defects. They alleged breach of the implied warranty of habitability, breach of contract (implied covenant of good faith and fair dealing), negligent and/or intentional misrepresentation, and violations of the CPA.

¶3 Of the 37 plaintiffs initially named in this action, 11 purchased their homes from sellers who had purchased new homes directly from Harbour Homes. These 11 subsequent homeowners (homeowners) obtained assignments of all claims from those original purchasers. Harbour Homes moved to compel arbitration of the claims of those plaintiffs who purchased homes directly from it. The trial court granted that motion.

¶4 Apparently, there was no basis for arbitrating the claims of the remaining plaintiffs. Accordingly, the homeowners' claims remained to be tried.

¶5 Harbour Homes then moved for summary judgment against the homeowners. One homeowner nonsuited by stipulation of the parties, leaving the current 10 homeowners whose claims are at issue on appeal.

¶6 The court granted the motion, dismissing all claims. The trial court also granted the homeowners' motion for CR 54(b) certification of the summary judgment order.

¶7 The homeowners appeal.

## IMPLIED WARRANTY OF HABITABILITY

¶8 The homeowners argue that the trial court erred in dismissing their cause of action for breach of the implied warranty of habitability on summary judgment because such claims are assignable as a matter of law. We disagree.

¶9 A motion for summary judgment may be granted when there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law.[1] We review a summary judgment order de novo,

---

[1] CR 56(c).

viewing the facts and reasonable inferences in the light most favorable to the nonmoving party.[2]

■ ■ ¶10 Generally, contract rights may be freely assigned unless forbidden by statute or rendered ineffective for public policy reasons.[3] In Washington, the doctrine of implied warranty of habitability protects the first occupants of residential property against the risk of fundamental defects in the structure of a home.[4]

¶11 Washington adopted the implied warranty of habitability in *House v. Thornton*.[5] In *House*, a builder/vendor constructed a house on an unstable site, resulting in severe deterioration of the foundation.[6] The court held the builder liable, defining the implied warranty rule as follows:

> We apprehend it to be the rule that, when a vendor-builder sells a new house to its first intended occupant, he impliedly warrants that the foundations supporting it are firm and secure and that the house is structurally safe for the buyer's intended purpose of living in it. Current literature on the subject overwhelmingly supports this idea of an implied warranty of fitness in the sale of new houses.[7]

¶12 Later cases have upheld the rule's application only to first purchaser/occupants. In *Klos v. Gockel*,[8] the builder lived in the house for a year before selling it to the plaintiffs, who then sued under the warranty of habitability for damage from a mud slide. In holding the damage insufficient to invoke the warranty, the court noted that "for

---

[2] *Khung Thi Lam v. Global Med. Sys.*, 127 Wn. App. 657, 661 n.4, 111 P.3d 1258 (2005).

[3] *Fed. Fin. Co. v. Gerard*, 90 Wn. App. 169, 177, 949 P.2d 412 (1998).

[4] *Stuart v. Coldwell Banker Commercial Group, Inc.*, 109 Wn.2d 406, 416, 745 P.2d 1284 (1987).

[5] 76 Wn.2d 428, 436, 457 P.2d 199 (1969).

[6] *Id.* at 429-31.

[7] *Id.* at 436.

[8] 87 Wn.2d 567, 554 P.2d 1349 (1976).

purposes of warranty liability, the house purchased must be a 'new house.' "[9]

¶13 In *Gay v. Cornwall*,[10] the implied warranty applied because plaintiffs were the first occupants of the house (although they were its third owners). The court held, "[I]n the instant situation, privity between plaintiff and defendant builder is not a prerequisite to imposing liability on a builder whose completed product is unfit for the purpose contemplated by the parties."[11] But the court also made clear that it was discussing situations of "brand-new housing."[12]

¶14 In *Frickel v. Sunnyside Enterprises, Inc.*,[13] several dissenting justices lamented' the fact that Washington's implied warranty applies only to original purchaser/occupants. In urging extension of the warranty, three justices noted that insulating builders from liability on the grounds that damage may be caused by intervening tenants was "unsupportable" where the defects were latent, and that an extension of the warranty to subsequent purchasers would not involve unlimited liability for the builders because the warranty would apply only for the statutory six-year statute of repose.[14] The majority did not adopt this position.

¶15 The court's rejection of this view was made clear when it decided *Stuart v. Coldwell Banker Commercial Group, Inc.*,[15] the following year. The court cited *Frickel* as support for its observation that "[t]his court has not been anxious to extend the implied warranty of habitability

---

[9] *Id.* at 571.

[10] 6 Wn. App. 595, 494 P.2d 1371 (1972).

[11] *Id.* at 597.

[12] *Id.*

[13] 106 Wn.2d 714, 725 P.2d 422 (1986) (court declined to extend implied warranty of habitability to sale of apartment complex despite serious foundation defects and improper construction, where property was not built for resale and sales contract contained express disclaimers of such warranty).

[14] *Id.* at 729-30.

[15] 109 Wn.2d 406, 745 P.2d 1284 (1987).

beyond its present boundaries."[16] Refusing to recognize a cause of action for negligent construction, the court stated:

> Imposition of tort liability upon the builder-vendors would require them to become the guarantors of the complete satisfaction of future purchasers. A builder-vendor could contract to limit [his] liability for defects with the original purchaser and then find themselves [sic] liable for the same defects to a future purchaser with whom they had absolutely no contact.[17]

Subsequent cases have adhered to this rule.[18]

¶16 Here, the homeowners contend that their implied warranty claim was proper because the original owners (the first purchaser/occupants) assigned their implied warranty claims to them. They assert that the majority of other states have extended the implied warranty of habitability to subsequent owners, limited only by a period of years. They argue that the assignment of such claims does not extend a builder/vendor's liability because the assignee merely stands in the shoes of the assignor, subject to all original defenses.

¶17 We are not persuaded by the suggestion that other states have allowed those other than the first purchasers from a developer to recover on claims based on the implied warranty of habitability.[19] What is clear is that the supreme court and other courts in this state have consistently refused to expand liability of developers to those beyond the

---

[16] *Id.* at 416.

[17] *Id.* at 421.

[18] *See, e.g., Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.,* 115 Wn.2d 506, 526-27, 799 P.2d 250 (1990) (Homeowner's negligent construction claim barred because " 'the only recognized duty owing from a builder-vendor of a newly completed residence to its first purchaser is that embodied in the implied warranty of habitability, which arises from the sale transaction.' " (quoting *Stuart,* 109 Wn.2d at 417)).

[19] *See* Michael A. DiSabatino, Annotation, *Liability of Builder of Residence for Latent Defects Therein as Running to Subsequent Purchasers from Original Vendee,* 10 A.L.R. 4TH 385 (1981 & Supp. 2008) (noting that courts of different states have taken different positions as to whether an implied warranty of merchantability or habitability should extend from a builder to remote purchasers with whom the builder has no contractual privity).

first purchasers of new homes. The fact that these home-owners are assignees of claims of the original homeowners does not alter our view that the result should be the same. Under *Stuart* and other precedent, the trial court correctly ruled that the implied warranty of habitability does not apply to these homeowners, who are assignees of the first purchasers from the developer.

## ECONOMIC LOSS RULE

¶18 The homeowners also argue that summary judgment was improper because the economic loss rule does not apply to intentional fraud claims or to the claims of subsequent homeowners who did not contract with the builder. We disagree.

¶19 The economic loss rule applies to hold parties to their contract remedies when a loss potentially implicates both tort and contract relief.[20] "The rule 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract'" because "'tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement.'"[21]

¶20 In *Alejandre v. Bull*,[22] our supreme court held that a homebuyer's negligent misrepresentation tort claim against the seller was precluded under the economic loss rule.[23] The court explained, "If the claimed loss is an economic loss and no exception applies to the economic loss rule, then the parties will be limited to contractual remedies."[24] The injury complained of in *Alejandre* was a failed septic sys-

---

[20] *Alejandre v. Bull*, 159 Wn.2d 674, 681, 153 P.3d 864 (2007).

[21] *Id.* at 682 (internal quotation marks omitted) (quoting *Factory Mkt., Inc. v. Schuller Int'l, Inc.*, 987 F. Supp. 387, 395 (E.D. Pa. 1997)).

[22] 159 Wn.2d 674, 153 P.3d 864 (2007).

[23] *Id.* at 689.

[24] *Id.* at 684.

tem.[25] The court characterized this as "[p]urely economic damages" because defects evidenced by internal deterioration are characterized as economic losses.[26]

¶21 Here, the claimed injuries all relate to defects of internal deterioration of the homes. As in *Alejandre* and the cases on which it relies, purely economic damages are at issue here. As assignees, the economic loss rule precludes the homeowners from recovering in tort.

¶22 The homeowners argue that the economic loss rule does not or should not apply to their assigned claim for intentional misrepresentation (fraud) because the rule does not apply to fraud claims. They concede that their assigned claim for negligent misrepresentation fails under *Alejandre* but rely on the same case to argue that the rule should not bar recovery for intentional misrepresentation.

¶23 The court in *Alejandre* recognized that fraudulent concealment claims are not precluded by the economic loss rule.[27] But no Washington court has held that a claim for intentional misrepresentation (fraud) falls outside of the economic loss rule. The two tort claims have distinct elements. A claim for fraudulent concealment requires a plaintiff to show

> (1) [that] the residential dwelling has a concealed defect; (2) the vendor has knowledge of the defect; (3) the defect presents a danger to the property, health, or life of the purchaser; (4) the defect is unknown to the purchaser; and (5) the defect would not be disclosed by a careful, reasonable inspection by the purchaser.[28]

The nine elements of intentional misrepresentation (fraud) are

---

[25] *Id.* at 685.

[26] *Id.* (citing *Stuart*, 109 Wn.2d at 420 ("Defects of quality are evidenced by internal deterioration, and designated as economic loss, while loss stemming from defects that cause accidents involving violence or collision with external objects is treated as physical injury.")).

[27] *Alejandre*, 159 Wn.2d at 689 (citing *Atherton*, 115 Wn.2d 523-27).

[28] *Id.*

(1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon the representation; and (9) damages suffered by the plaintiff.[29]

Given the difference in elements between the two types of claims, there is no reason to conclude that an intentional misrepresentation claim should be treated the same as the fraudulent concealment claim in *Alejandre*. More importantly, there is no reason here to exempt an intentional misrepresentation claim from the general exclusion of tort-based claims under the rationale of the economic loss rule.

¶24 Although the homeowners cite to *Baddeley v. Seek*,[30] a Division Three case, and *Stieneke v. Russi*,[31] from Division Two, for support of their argument, neither court expressly decided that intentional misrepresentation and fraud claims fall outside the scope of the economic loss rule. The court in *Baddeley* did not reach the question of whether the economic loss rule bars fraud claims in Washington.[32] Instead, it held that the plaintiffs' intentional misrepresentation claims failed because they failed to show all of the necessary elements of fraud.[33]

¶25 In *Stieneke*, Division Two denied a claim for negligent misrepresentation under the economic loss rule and *Alejandre* but still considered the merits of a fraud claim.[34] The *Stieneke* court did not expressly consider the potential barring effect of the economic loss rule on the fraud claim. Thus, the case is not helpful here.

---

[29] *W. Coast, Inc. v. Snohomish County*, 112 Wn. App. 200, 206, 48 P.3d 997 (2002).

[30] 138 Wn. App. 333, 156 P.3d 959 (2007).

[31] 145 Wn. App. 544, 190 P.3d 60 (2008).

[32] *Baddeley*, 138 Wn. App. at 338-39.

[33] *Id.* at 339.

[34] *Stieneke*, 145 Wn. App. at 559-65.

¶26 Because we have no basis to depart from the application of the economic loss rule here, we conclude that the trial court properly dismissed this claim.

¶27 Additionally, the homeowners argue that the economic loss rule does not bar their direct (nonassigned) claim for negligent misrepresentation because they had no contractual privity with Harbour Homes as to this direct claim. They cite to section 552 of the *Restatement (Second) of Torts* for support.

¶28 The supreme court addressed similar arguments in *Berschauer/Phillips Construction Co. v. Seattle School District No. 1.*[35] In that case, the court considered claims brought by a general contractor against the architects and engineers of a construction project. The contractor asserted claims as an assignee of the project's owner and in its own right. The court barred the claims under the economic loss rule, specifically discussing the contractor's direct claim:

> Alternatively, Berschauer/Phillips requests that this court apply the Restatement (Second) of Torts § 552 (1977) to permit a general contractor not in privity of contract to bring a tort cause of action against a design professional for negligent misrepresentations. We acknowledge that § 552 provides support for the recovery of economic damages in the construction industry for negligent misrepresentations. The Restatement is equivocal in its support, however. We also acknowledge that the tort of negligent misrepresentation is recognized in Washington. We hold that when parties have contracted to protect against potential economic liability, as is the case in the construction industry, contract principles override the tort principles in § 552 and, thus, purely economic damages are not recoverable.
>
> There is a beneficial effect to society when contractual agreements are enforced and expectancy interests are not frustrated. In cases involving construction disputes, the con-

---

[35] 124 Wn.2d 816, 881 P.2d 986 (1994).

tracts entered into among the various parties shall govern their economic expectations.[36]

¶29 In any event, the homeowners here have failed to articulate a cognizable negligent misrepresentation claim. They have not demonstrated what, if any, duty Harbour Homes owed to them. The record does not show that Harbour Homes made any representations directly to the homeowners, that the homeowners knew about the representations made to the original purchasers, or that the homeowners justifiably relied on Harbour Homes's information.

¶30 Because we affirm the summary judgment dismissing these claims on the bases discussed, we need not reach Harbour Homes's other arguments.

## ASSIGNMENT OF CLAIMS

¶31 Harbour Homes argues that all of the homeowners' assigned claims are invalid. We disagree.

¶32 Contracts are assignable unless such assignment is expressly prohibited by statute, contract, or is in contravention of public policy.[37] The traditional test for whether a cause of action is assignable is whether the claim would survive to the personal representative of the assignor upon death.[38] If it would, the cause of action is assignable.[39] A right of action arising from a contract is a chose in action and personal property.[40]

---

[36] *Id.* at 827-28 (citations omitted).

[37] *Id.* at 829.

[38] *Cooper v. Runnels*, 48 Wn.2d 108, 110, 291 P.2d 657 (1955).

[39] *Harvey v. Cleman*, 65 Wn.2d 853, 855, 400 P.2d 87 (1965); *Woody's Olympia Lumber, Inc. v. Roney*, 9 Wn. App. 626, 633, 513 P.2d 849 (1973).

[40] *Ennis v. Ring*, 49 Wn.2d 284, 289, 300 P.2d 773 (1956); *see also Mueller v. Rupp*, 52 Wn. App. 445, 450-51, 761 P.2d 62 (1988) ("A chose in action is personal property.").

¶33 No particular words of art are required to create a valid and binding assignment.[41] Any language showing the owner's intent to transfer and invest property in the assignee is sufficient.[42] An assignee "steps into the shoes of the assignor, and has all of the rights of the assignor."[43]

¶34 Because causes of action are personal property, the original purchasers here retained their legal interests in the claims against Harbour Homes up until the time they expressly assigned the claims to the homeowners. Harbour Homes has cited no authority to suggest that CPA or other claims arising from construction defects require continued ownership of the underlying real property.

¶35 Harbour Homes asserts that the original purchasers' assignments to the homeowners are invalid because the original owners had no present legal interest in the homes when the assignments were executed. But Harbour Homes fails to distinguish between the original purchasers' present legal interest in the **homes** when the assignments were executed and the original purchasers' present legal interest in any **claims** they had against Harbour Homes.

¶36 Relying on *Robbins v. Hunts Food & Industries, Inc.*,[44] Harbour Homes argues that claims involving " 'personal confidence' " are an exception to the general assignability of claims.[45] But the issue in *Robbins* was whether an executory sales contract making one party the exclusive sales agent of the other could be assigned. The court noted the personal confidence exception but found that it did not apply where there was no evidence the contract was based

---

[41] *Amende v. Town of Morton*, 40 Wn.2d 104, 106, 241 P.2d 445 (1952).

[42] *Id.*

[43] *Puget Sound Nat'l Bank v. Dep't of Revenue*, 123 Wn.2d 284, 292, 868 P.2d 127 (1994).

[44] 64 Wn.2d 289, 391 P.2d 713 (1964).

[45] Brief of Respondent at 10 (quoting *Robbins*, 64 Wn.2d at 294).

"upon the business and financial skill, judgment, and credit" of the assignor.[46]

¶37 Here, unlike *Robbins*, the assignments at issue are assignments of claims, not contractual performance. Moreover, this case does not involve executory contracts or a "relation of personal confidence." The personal confidence exception does not apply.

¶38 Harbour Homes also challenges the validity of the assigned claims in that the assignments were not made "for the payment of money" as it claims is required under RCW 4.08.080.

¶39 Questions of statutory construction are reviewed de novo.[47]

¶40 RCW 4.08.080 provides:

**Action on assigned choses in action.** Any assignee or assignees of any judgment, bond, specialty, book account, or other chose in action, *for the payment of money*, by assignment in writing, signed by the person authorized to make the same, may, by virtue of such assignment, sue and maintain an action or actions in his or her name, against the obligor or obligors, debtor or debtors, named in such judgment, bond, specialty, book account, or other chose in action, notwithstanding the assignor may have an interest in the thing assigned: PROVIDED, That any debtor may plead in defense as many defenses, counterclaims and offsets, whether they be such as have heretofore been denominated legal or equitable, or both, if held by him against the original owner, against the debt assigned, save that no counterclaim or offset shall be pleaded against negotiable paper assigned before due, and where the holder thereof has purchased the same in good faith and for value, and is the owner of all interest therein.[48]

¶41 Harbour Homes insists that the "for the payment of money" clause requires that parties assign their claims "for the payment of money" in order to be valid.

---

[46] *Robbins*, 64 Wn.2d at 294-95.

[47] *Ballard Square Condo. Owners Ass'n v. Dynasty Constr. Co.*, 158 Wn.2d 603, 612, 146 P.3d 914 (2006).

[48] (Emphasis added.)

¶42 The supreme court has rejected a reading of the statute that would require consideration "for the payment of money." In *Yamamoto v. Puget Sound Lumber Co.*,[49] the court interpreted Remington's 1915 Code section 191, the predecessor to RCW 4.08.080. In examining the same statutory language at issue here,[50] the court upheld the validity of assigned claims without a showing of consideration:

> As to the objection of a want of consideration for the assignments, there was no need of any express consideration. The assignments being in writing, the assignee became vested with the legal title to the claims assigned, and could maintain an action thereon in his own name, notwithstanding each assignor may have retained an interest in his particular claim.[51]

In light of *Yamamoto*, we reject Harbour Homes's argument that the homeowners' assignments were invalid for lack of an express "payment of money."

¶43 In sum, we conclude that the CPA claims are assignable. Several Washington cases have recognized CPA claims brought by assignees.[52] Moreover, in light of the generally broad assignability of contracts[53] and claims,[54] it is significant that Harbour Homes has cited no authority to the contrary.

---

[49] 84 Wash. 411, 146 P. 861 (1915).

[50] Rem. 1915 Code § 191.

[51] *Yamamoto*, 84 Wash. at 414.

[52] *See, e.g., Steinmetz v. Hall-Conway-Jackson, Inc.*, 49 Wn. App. 223, 228-29, 741 P.2d 1054 (1987) (dismissal of an assigned CPA claim at summary judgment reversed and remanded for determination of damages); *Werlinger v. Clarendon Nat'l Ins. Co.*, 129 Wn. App. 804, 808-09, 120 P.3d 593 (2005) (assigned CPA claim decided on the merits).

[53] *Berschauer/Phillips*, 124 Wn.2d at 829 (Contracts are assignable unless such assignment is expressly prohibited by statute, contract, or is in contravention of public policy.).

[54] *Cooper*, 48 Wn.2d at 110 (causes of action are assignable if they would survive to the personal representative of the assignor upon death); RCW 4.20.046 (survival of actions).

¶44 We also conclude that the homeowners' obtained valid assignments of the original purchasers' breach of contract claims. Even general antiassignment clauses in contracts, aimed at prohibiting the assignment of contractual performance, will not be construed to prohibit assignments of a breach of contract cause of action unless the contract contains specific language to the contrary.[55] Here, Harbour Homes has not shown the assigned claims for breach to be invalid.

## CONSUMER PROTECTION ACT

¶45 The homeowners argue that the trial court erred in dismissing their assigned CPA cause of action on summary judgment. We agree.

¶46 In order to maintain a private CPA action, a plaintiff must establish five elements: (1) an unfair or deceptive act or practice (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive acts and the injury suffered by the plaintiff.[56] Only the first and fifth elements are disputed here.

¶47 The CPA does not define "unfair or deceptive act or practice." Whether an alleged act is unfair or deceptive is a question of law.[57] An unfair or deceptive act or practice need not be intended to deceive, it need only have the capacity to deceive a substantial portion of the public.[58]

¶48 The homeowners contend that Harbour Homes engaged in unfair and deceptive practices by making affir-

---

[55] *Berschauer/Phillips*, 124 Wn.2d at 829-30.

[56] *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986); RCW 19.86.020.

[57] *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 150, 930 P.2d 288 (1997); *see also Griffith v. Centex Real Estate Corp.*, 93 Wn. App. 202, 214, 969 P.2d 486 (1998).

[58] *Hangman Ridge*, 105 Wn.2d at 785.

mative representations of quality, workmanship, and construction in marketing materials and then failing to provide homes that met the standards as represented. They also contend that Harbour Homes's failure to disclose known defects in the homes constituted unfair or deceptive acts.

¶49 Viewing the evidence in the light most favorable to the homeowners, we conclude that this record substantiates that there were "unfair or deceptive acts," the first element of a CPA claim. Harbour Homes provided marketing materials with affirmative representations of quality. It represented that in their homes, "maintenance is kept to a minimum for many years due to the high quality of material and workmanship included in every Harbour Home[ ]"; that "[o]ur goal is to provide each of our home buyers with a home of the highest quality and workmanship . . . "; and that "[d]uring the course of construction, each of our homes is inspected several times by our quality control managers," among others. The record also shows that the homes contained numerous construction deficiencies and that the deficiencies have caused the homes to suffer from excessive deterioration and damage. The deficiencies amount to the builder's failure to properly seal and protect the homes from weather and moisture, resulting in water intrusion, rot, and mold in the homes. The homeowners have made a showing of unfair and deceptive acts under the CPA.

¶50 The homeowners also argue that Harbour Homes engaged in unfair or deceptive acts in failing to disclose known defects in the home. We agree.

¶51 A seller's failure to disclose material facts to the purchaser in a real estate transaction may support a CPA claim, even if the circumstances do not establish fraudulent concealment.[59] In *Griffith v. Centex Real Estate Corp.*,[60] this court recognized a general duty on the part of a seller to disclose facts material to a transaction when the facts are

---

[59] *Chan Ngoc Nguyen v. Doak Homes, Inc.*, 140 Wn. App. 726, 734, 167 P.3d 1162 (2007) (citing *Griffith*, 93 Wn. App. at 217).

[60] 93 Wn. App. 202, 969 P.2d 486 (1998).

known to the seller but not easily discoverable by the buyer.[61] Here, because of the magnitude of the defects in the homes, which have been shown to be results of the original construction, we conclude that these defects are material and not easily discoverable by the purchasers. It is undisputed that Harbour Homes failed to disclose these facts. This failure to disclose constitutes an unfair and deceptive practice for purposes of the CPA.

¶52 Here, Harbour Homes argues that its acts were not unfair or deceptive because the failure to build a quality home is merely an inadequacy in service, citing to *Ramos v. Arnold*[62] for support. *Ramos* involved a purchaser's claim against a home appraiser for failing to include defects in the residence in the appraisal report.[63] The court held that the claim did not constitute a deceptive act under the CPA, reasoning:

> The term "trade" as used by the [CPA] includes only the entrepreneurial or commercial aspects of professional services, not the substantive quality of services provided. Entrepreneurial aspects include how the cost of services is determined, billed, and collected and the way a professional obtains, retains, and dismisses clients. Claims directed at the competence of and strategies employed by a professional amount to allegations of negligence and are exempt from the Consumer Protection Act.[64]

The facts here are distinguishable from *Ramos*. While Harbour Homes attempts to characterize its acts as merely a failure to build quality homes, the record also includes marketing materials with affirmative representations as to the high quality of the homes. The homeowners are not simply challenging the competence of Harbour Homes as a builder, which would go to the substantive quality of services. They also challenge the commercial and entrepre-

---

[61] *Id.* at 214-15.

[62] 141 Wn. App. 11, 169 P.3d 482 (2007).

[63] *Id.* at 20.

[64] *Id.* (citations omitted).

neurial acts of marketing to potential homebuyers with representations of high quality. Additionally, the homeowners, like the plaintiffs in *Griffith*, challenge Harbour Homes's failure to disclose material facts when the builder knew of its purchasers' expectations and knew of defects in its construction.

¶53 *Chan Ngoc Nguyen v. Doak Homes*[65] is also distinguishable. There, the court affirmed the dismissal of a second purchaser/occupant's CPA claim where her only evidence of a builder's unfair or deceptive act was a report showing that the builder failed to comply with industry standards.[66] But again, the homeowners do not merely claim that Harbour Homes failed to meet industry standards. Their contention is that Harbour Homes's plainly deficient construction, together with its affirmative representations of high quality and workmanship, constitutes an unfair or deceptive act or practice.

¶54 The homeowners also argue that their CPA claim was improperly dismissed because there was a genuine issue of material fact as to causation. We agree.

¶55 To establish the causation element in a CPA claim, a plaintiff must show that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury.[67] Proximate cause is a factual question to be decided by the trier of fact.[68]

¶56 Here, the record includes declarations of three original purchasers who assigned their claims to the appellants. These declarations demonstrate that Harbour Homes represented to the original purchasers that its homes were of highest quality and workmanship, that the purchasers relied on these representations, and that the purchasers

---

[65] 140 Wn. App. 726, 167 P.3d 1162 (2007).

[66] *Id.* at 733-34.

[67] *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 84, 170 P.3d 10 (2007).

[68] *Id.*

would not have purchased the homes if they did not believe Harbour Homes's statements.

¶57 Harbour Homes argues that summary judgment was proper because the homeowners have not met their burden to prove that they relied on any assertion of Harbour Homes "because Harbour Homes did not make any assertions to the Subsequent Purchasers."[69] But Harbour Homes ignores the fact that the subsequent homeowners stand in the shoes of the original purchasers as assignees for purposes of the CPA claim in this case.[70]

¶58 We conclude that the homeowners have shown genuine issues of material fact for trial on their CPA claim. Summary judgment was improper.

## BREACH OF CONTRACT

¶59 Finally, the homeowners assert that dismissal of their assigned breach of contract claim was improper. We disagree.

¶60 The basis of the homeowners' claim is breach of the duty of good faith and fair dealing to each of the homeowners or their assignors. The duty of good faith and fair dealing is implied in every contract.[71] This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance.[72] But the duty of good faith does not " 'inject substantive terms into the parties' contract'."[73] Rather, "it requires only that the parties perform in good faith the obligations imposed by their agreement."[74] The supreme court has "consistently

---

[69] Brief of Respondent at 22-23.

[70] See Puget Sound Nat'l Bank, 123 Wn.2d at 292.

[71] Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991).

[72] Id.

[73] Id. (quoting Barrett v. Weyerhauser Co. Severance Pay Plan, 40 Wn. App. 630, 635 n.6, 700 P.2d 338 (1985)).

[74] Id.

held there is no 'free-floating' duty of good faith and fair dealing that is unattached to an existing contract."[75] The duty exists only in relation to performance of a specific contract term.[76]

¶61 At oral argument, the homeowners represented that Harbour Homes did not perform in good faith in relation to specific contractual terms regarding construction according to certain plans and representations of quality. Nothing in the record substantiates this claim, and this point was not argued to the trial court. Because there is no "free-floating" duty of good faith and fair dealing apart from the terms of an existing contract, the trial court did not err in granting summary judgment as to this claim.

## SUMMARY

¶62 To summarize, the homeowners hold valid assignments of the claims of those who purchased the residential properties from Harbour Homes. There is no showing by Harbour Homes that the claims are personal or otherwise subject to any bar to assignment.

¶63 The rationale of *Stuart* and other cases bars the attempt in this case to allow subsequent purchasers to sue Harbour Homes, the developer. The economic loss rule bars the claim for intentional misrepresentation. The homeowners properly concede they have no claim for negligent misrepresentation against Harbour Homes. This record does not support a claim for breach of good faith and fair dealing.

¶64 The assignment of the CPA claim has not been shown to be invalid. There are genuine issues of material fact requiring trial of this claim. We note that this case does not present any public policy or other reasons why CPA claims are not assignable. Accordingly, we limit our discussion to the type of CPA claims alleged in this case.

---

[75] *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 177, 94 P.3d 945 (2004).

[76] *Id.*

## ATTORNEY FEES

█ ¶65 Harbour Homes seeks attorney fees on appeal pursuant to RAP 14.3 and 18.9(a), arguing that the homeowners' appeal is frivolous. Under RAP 18.9(a), an appellate court may impose sanctions for a frivolous appeal. An appeal is frivolous if there are no debatable issues upon which reasonable minds might differ and it is so totally devoid of merit that there is no reasonable possibility of reversal.[77] Because this standard is not met in this case, this appeal is not frivolous, and Harbour Homes is not entitled to attorney fees here.

¶66 We affirm in part, reverse in part, and remand for further proceedings.

SCHINDLER, C.J., and LEACH, J., concur.

Reconsideration denied November 20, 2008.

Review granted at 166 Wn.2d 1015 (2009).

---

[77] *State ex rel. Quick-Ruben v. Verharen*, 136 Wn.2d 888, 905, 969 P.2d 64 (1998).