[No. 37194-4-II.   Division Two.   May 5, 2009.]

TERRANCE S. COX ET AL., *Appellants*, v. JAMES H. O'BRIEN ET AL., *Defendants*, DANNY D. DEMERS ET AL., *Respondents*.

---

*William H. Broughton* (of *Broughton & Singleton, Inc.*), for appellants.

*Gregory J. Wall* (of *Gregory J. Wall & Associates, PLLC*), for respondents.

¶1 HUNT, J. — Terrance and Julie Cox appeal the trial court's dismissal of their plaintiff/fourth-party defendant claims against Danny and Mary DeMers, based on unknown structural damage in a 23-year-old house that the Coxes purchased from the DeMers for which the Coxes waived a home inspection. The Coxes argue that the trial court erred in (1) invalidating pest inspector O'Brien's "indemnity agreement" with them and the DeMers as contrary to the economic loss rule and in violation of public policy, (2) denying their (the Coxes') cross motion for partial summary judgment on their counterclaim for damages against the DeMers, and (3) dismissing their (the Coxes') claims for unjust enrichment against the DeMers. Holding that the economic loss rule barred the Coxes' counterclaims claims against the DeMers for negligent representation and fraudulent representation, we affirm.[1]

## FACTS

### I. HOME SALE

¶2 In June 2000, Danny and Mary DeMers sold their 23-year-old home to Terrance and Julie Cox. The DeMers

---

[1] Accordingly, we do not reach the Coxes' other arguments.

had lived in the home from the time it was built in 1977 until 1995, when they converted it into a rental property. During the next five years, the DeMers rented the house to several different tenants.

¶3 In 2000, the DeMers listed the house for sale at $169,500. The Coxes, friends of the DeMers, learned about the property through a realtor and presented an offer to buy it. After negotiating a price, they settled on $162,500. On June 19, 2000, the DeMers and the Coxes signed a purchase and sale agreement. This agreement required the DeMers to pay for a roof inspection, a septic inspection, and a pest inspection. Beyond promising to obtain these three specific inspections, however, the DeMers made no warranties to the Coxes about the physical integrity of the home.

¶4 As part of the purchase and sale agreement, the DeMers also completed, and the Coxes signed, a Form 17 "Real Property Transfer Disclosure Statement." This statement provided, in pertinent part:

> FOR A MORE COMPREHENSIVE EXAMINATION OF THE SPECIFIC CONDITION OF THIS PROPERTY, *YOU ARE ADVISED TO OBTAIN AND PAY FOR THE SERVICES OF A QUALIFIED SPECIALIST TO INSPECT THE PROPERTY ON YOUR BEHALF,* FOR EXAMPLE ARCHITECTS, ENGINEERS, LAND SURVEYORS, PLUMBERS, ELECTRICIANS, ROOFERS, BUILDING INSPECTORS, OR PEST AND DRY ROT INSPECTORS.

Clerk's Papers (CP) at 72 (emphasis added).

## II. INSPECTIONS AND WAIVER

¶5 The Coxes knew about the home's age and use as a rental property. But against the advice of their realtor, they chose not to hire a specialist to conduct a full structural inspection. Instead, on June 19, they executed an "ADDENDUM AMENDMENT TO THE PURCHASE AND SALE

AGREEMENT," waiving their right to a structural home inspection before closing the sale.[2]

¶6 In compliance with the purchase and sale agreement, the DeMers paid for a roof inspection, a septic inspection, and a pest inspection. They hired James O'Brien of O'Brien Home Inspection Services, a certified pest inspector.

¶7 The DeMers and the Coxes both signed an agreement with O'Brien, which included the following "LIMITATION OF LIABILITY":

> The above inspecting firm [O'Brien] Home Inspection endeavors to perform its services in a professional manner consistent with the care and skill ordinarily exercised by similar pest control professionals. No warranty, express or implied, other than as set forth herein, is made or intended by performing the work identified in this agreement. *Should this firm, or its employees, be found to have been negligent in the "performance of services," it is agreed that the maximum total recovery against us or our employees shall be limited to our fee for the services provided under this agreement.*
>
> In the event that any person or company makes a claim for any alleged error, omission, or other act arising out of their performance of professional services under this contract, each signor of this agreement agrees to defend and hold us harmless from any such claim, including reasonable attorney[ ] fees and costs incurred by us in defending against the claim.
>
> **Acceptance: This report is of no force or effect unless signed by the Seller and the Purchaser and a copy returned to the inspecting firm. We have read the report and inspection standards and understand all the terms and conditions thereof, including the scope and limitations thereof and do accept the same.**

Br. of Appellant, App. at Ex. A (italics added). O'Brien, the Coxes, and the DeMers all signed the "Limitation of Liability" beneath the bold wording quoted above. After inspecting the DeMers' home, O'Brien certified that the residence was pest-free.

---

[2] The relevant provision of this agreement provided: "Buyer has waived the right to get an inspection on the home." CP at 112.

### III. Discovery of Structural Damage and O'Brien's Partial Repair

¶8 The Coxes and the DeMers closed the sale. After the Coxes took possession of the home, Julie Cox noticed that the bathroom tiles were loose and cracked, the bathroom wall was rotten, and the sun-room's walls were rotten and unstable. At that point, the Coxes hired another pest inspector, who confirmed that the walls in the bathroom and sun-room areas had been structurally damaged due to "rot,"[3] which O'Brien had failed to detect. The Coxes contacted O'Brien and told him what they had found.

¶9 O'Brien returned to the Coxes' home to view the bathroom and sun-room areas. In an effort to "make things work" for the Coxes, O'Brien hired a contractor to start reconstructing the sun-room. O'Brien's hired crew removed the sun-room's exterior walls and replaced support beams that had rotted. After O'Brien's crew had finished replacing the walls and support beams, they realized that the job was much larger than what they had bid and decided not to finish. The Coxes and O'Brien agreed that the Coxes would pay one-third of the sun-room's $5,788 repair costs and that O'Brien would pay the remaining two-thirds.

¶10 Later, the Coxes hired another contractor to finish the work that O'Brien's crew had begun. This work cost the Coxes approximately $2,500.

### IV. Lawsuit

¶11 On December 21, 2001, the Coxes sued O'Brien and his inspection company, seeking damages for his negligent pest inspection of their home. The Coxes did not name the DeMers as defendants.

---

[3] The record does not distinguish between pest and nonpest caused "rot." All of the structural damage to the home is described as "rot," without indicating whether it was caused by fungi, insects, rodents, water damage, mold, or otherwise. Nor does the record indicate what portions of this "rot" O'Brien should have discovered during his pest inspection.

## A. Pleadings, Motions, Settlement with O'Brien

¶12 On August 23, 2004, O'Brien filed an amended answer and third-party complaint against the DeMers, claiming that they had breached their contract with him, entitling him to damages, costs, and fees. O'Brien also asked the trial court to dismiss the Coxes' claims with prejudice. In response, the DeMers asked the trial court to dismiss with prejudice O'Brien's third-party complaint against them.

¶13 In 2005, the Coxes settled with O'Brien for $20,000, plus the assignment of any indemnity rights he might have against the DeMers under the pest inspection Limitation of Liability provision, to which the parties here sometimes refer as the "indemnity agreement."[4]

¶14 On October 27, 2006, the DeMers filed a "Counterclaim and Fourth Party Complaint" against the Coxes and O'Brien, asserting that (1) O'Brien's failure to detect the structural damage had exposed them to litigation and costs (counterclaim); and (2) if the trial court concluded that O'Brien's "indemnification" provision was valid, the court should rule that the Coxes owed an equal duty to O'Brien, including a duty of contribution for one-half of any damages awarded (fourth-party complaint). On December 28, the Coxes filed an "Answer and Counterclaim" to the DeMers' fourth-party complaint, seeking an equitable remedy for unjustly enriching the DeMers (counterclaim).

¶15 On August 7, 2007, the DeMers answered the Coxes' counterclaim and asked the trial court to dismiss it with prejudice. On August 28, the DeMers moved for summary judgment. On September 17, the Coxes filed a response to the DeMers' motion for summary judgment and a cross motion for partial summary judgment against the DeMers, asking the trial court to enter judgment for them (the

---

[4] *See* Stipulation re: Assignment of Rights, *Cox v. O'Brien*, No. 01-2-03715-5 (Kitsap County Super. Ct., Wash. May 6, 2005).

Coxes) in the amount of $36,372.63 to cover O'Brien's attorney fees and the settlement he had paid them.[5]

## B. Trial on Unjust Enrichment Claim

¶16 On September 28, the trial court concluded that O'Brien's so-called "indemnity agreement" was void as against public policy because the agreement was not clearly drawn as required under *Dirk v. Amerco Marketing Co. of Spokane*, 88 Wn.2d 607, 565 P.2d 90 (1977). The trial court then concluded that unjust enrichment was the Coxes' only remaining claim. On October 23, the case went to trial on that claim.

¶17 At trial, the court heard testimony from Julie Cox and Mary DeMers. Julie Cox testified that (1) she and her husband had decided against obtaining a full structural home inspection because they assumed that the DeMers would tell them about any existing damage; (2) "[w]e knew the home was a fixer-upper in the standpoint it was built in '77," Report of Proceedings (RP) (Cox) at 55; (3) although they had received a final pest inspection from O'Brien, he "deemed that there were no faults that needed correction," RP (Cox) at 14; and (4) although she (Julie Cox) had noticed "moldy linoleum" when she moved into the home, she did not understand at the time that the mold was due to damage caused by rot, fungi, and pests. Mary DeMers testified that she and her husband were unaware of any structural damage in the home when they sold it to the Coxes.

¶18 On December 11, the trial court concluded that the Coxes had failed to make a prima facie case for their remaining unjust enrichment claim; the trial court dismissed this claim. The trial court also ruled that the economic loss rule barred the Coxes' counterclaims against the DeMers for negligent representation and fraudulent

---

[5] The Coxes believed O'Brien was entitled to this money because, as part of their settlement agreement, O'Brien had assigned to them his pest inspection agreement rights against the DeMers.

representation, denied the Coxes' cross motion for partial summary judgment, and dismissed their claims against the DeMers as a matter of law.

¶19 On December 31, 2007, the Coxes filed a notice of appeal, naming O'Brien and the DeMers as "defendants."[6]

## ANALYSIS

### I. O'BRIEN'S LIMITATION OF LIABILITY AGREEMENT

¶20 The Coxes argue that (1) the trial court erred in invalidating O'Brien's Limitation of Liability agreement (which they characterize as "the indemnity agreement") because O'Brien's failure to detect their home's structural problems resulted in a windfall to the DeMers; and (2) because the DeMers paid O'Brien a low fee for the pest inspection, it was reasonable for O'Brien to require the DeMers to indemnify him against the Coxes' damages for his inspection mistake.

¶21 The defendants counter that the economic loss rule bars the Coxes' claims because (1) the Coxes' request for purely economic damages is actually a tort claim, and (2) the economic loss rule restricts the parties to contractual remedies for such purely economic claims. Agreeing with the defendants that the economic loss rule controls, we do not reach the Coxes' arguments concerning the so-called "indemnity agreement."

### A. Standard of Review

¶22 When reviewing a trial court's decision on a motion for summary judgment, we apply the same standard as the trial court, reviewing a grant or denial of summary judgment de novo. *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 531, 70 P.3d 126 (2003). A motion for summary judgment is proper when, after reviewing the evidence in the light most

---

[6] Hereinafter, we refer to the DeMers and O'Brien collectively as "defendants."

favorable to the nonmoving party, the court can say as a matter of law that there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. *Id.* Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of a declared premise. *Id.*

## B. Economic Loss Rule

¶23 Citing *Alejandre v. Bull*, 159 Wn.2d 674, 682, 153 P.3d 864 (2007), both parties appear to concede that the economic loss rule applies and that the loss at issue here is the structural damage within the walls of the home, undiscovered until after the home sale closed and the Coxes moved in. In *Alejandre*, our Supreme Court discussed the economic loss rule as maintaining the fundamental boundaries of tort and contract law. *Id.* (citing *Berschauer/Phillips Constr. Co v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 826, 881 P.2d 986 (1994)).

¶24 Where economic losses occur, recovery is confined to contract to ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract. *Id.* at 683. A seller sets a price in consideration of potential contractual liability. *Id.* The economic loss rule prevents a party to a contract from obtaining through a tort claim benefits that were not part of the contractual bargain. *Id.* In short, the purpose of the economic loss rule is to bar recovery for alleged breach of tort duties where a contractual relationship exists between the parties and the losses are economic in nature. If the economic loss rule applies, a party will be held to the contractual remedies, regardless of how the plaintiff characterizes the claims. *Id.* at 684.

¶25 Division One of our court recently applied the economic loss rule in a context similar to the case here. In *Carlile v. Harbour Homes, Inc.*, 147 Wn. App. 193, 198, 194 P.3d 280 (2008), several homebuyers brought a fraud action (alleging intentional misrepresentation) against Harbour

Homes, Inc., for construction defects in their homes. Relying on *Alejandre*, Division One noted that because the damages at issue were purely economic, the economic loss rule precluded the homeowners from recovering in tort. *Id.* at 204. Concluding that Carlile had failed to provide a legal basis for his argument that fraud claims fall outside the economic loss rule, Division One affirmed the trial court's dismissal of Carlile's claim. *Id.* at 206.

¶26 Based on *Alejandre*, the defendants here argue that the economic loss rule bars the Coxes' claims because (1) the Coxes signed an express waiver to forgo a full home structural inspection before taking ownership and possession of the home; and (2) therefore, the contractual purchase and sale agreement between the DeMers and the Coxes precluded any claim of negligent misrepresentation of the home's structural integrity. We agree. Like the situation in *Carlile*, the Coxes sought economic damages to compensate them for the cost of repairing the structural damage to their home. But because these damages were purely economic, the economic loss rule precludes the Coxes from recovering in tort on their contract claim against the DeMers.

¶27 The DeMers fulfilled their contractual duty to the Coxes when they hired the pest, roof, and septic inspections as agreed under their purchase and sale agreement. In agreeing to pay for these inspections, however, the DeMers did not thereby guarantee that the inspections, in particular the pest inspection at issue here, would be accurate.

¶28 In contrast, the Coxes ignored their realtor's advice and expressly waived a structural inspection for this 23-year-old home, which they knew had been used as a rental for the preceding five years. Consequently, they assumed the risk of any structural defects when they bought and moved into the home.

¶29 Moreover, in spite of O'Brien's attempt to limit his liability in his so-called "indemnity agreement" with the DeMers, the Coxes recovered monetary damages from him for his negligent pest inspection: To compensate for his

failure to discover structural damage in the sun-room, O'Brien paid for and reconstructed two-thirds of the $5,788 sun-room. He also later settled with the Coxes for $20,000. In essence, the Coxes have recovered at least a substantial portion of their economic loss from O'Brien for his negligent pest inspection. Under the circumstances of this case, the Coxes do not have a cause of action in tort against the DeMers.

¶30 Affirming the trial court on this point, we hold, therefore, that the economic loss rule applies and bars the Coxes' counterclaims against the DeMers for negligent representation and fraudulent representation.[7]

## II. No Unjust Enrichment

¶31 The Coxes also argue that the trial court erred in dismissing their unjust enrichment claim and directing a verdict in favor of the DeMers because the home's hidden structural damage caused the DeMers to receive more money for the home than it was worth. This argument fails.

¶32 The defendants counter that the trial court correctly dismissed the Coxes' unjust enrichment claim because the facts of the case fail to meet any elements of unjust enrichment. The defendants argue that: (1) the Coxes did not confer a benefit on the DeMers because they bought the house at market value; (2) the DeMers made no warranty on the 23-year-old home, and there is no evidence that the DeMers misled the Coxes; and (3) the circumstances were not unjust, considering that the Coxes knew how old the house was and that it had been rented for the preceding five years. We agree with the defendants.

¶33 *Restatement (Third) of Restitution* explains that a person who is unjustly enriched at the expense of another is liable in restitution to the other. *Dragt v. Dragt/DeTray, LLC*, 139 Wn. App. 560, 576, 161 P.3d 473 (2007) (quoting

---

[7] Because the economic loss rule controls here, we need not reach the issue of whether O'Brien's Limitation of Liability is valid because it simply does not apply.

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1 (Discussion Draft 2000)), *review denied*, 163 Wn.2d 1042 (2008). A person has been unjustly enriched when he has profited or enriched himself at another's expense, contrary to equity. *Id.* But enrichment alone will not trigger the doctrine; rather, the enrichment must be unjust under the circumstances and as between the two parties to the transaction. *Id.*

¶34 To establish unjust enrichment, the claimant must meet three elements: (1) one party must have conferred a benefit to the other, (2) the party receiving the benefit must have knowledge of that benefit, and (3) the party receiving the benefit must accept or retain the benefit under circumstances that make it inequitable for the receiving party to retain the benefit without paying its value. *Id.*

¶35 In analyzing the Coxes' claim for unjust enrichment, the trial court noted that the existence of an inequity does not necessarily trigger the doctrine of unjust enrichment. The trial court ruled that the doctrine did not apply under the circumstances and, even if it did apply, the Coxes failed to meet the elements necessary to show unjust enrichment. Noting that the DeMers had been enriched by selling a house that was structurally damaged, however, the trial court ruled that such enrichment was not unjust because there was no evidence that the DeMers knew or should have known about the structural damage to the home. The DeMers had moved out of the residence in 1995, then rented the residence to tenants for five years; they testified at trial that they did not know about any structural damage. These facts demonstrate that the DeMers did not know and had no reason to know about the damage and, thus, support the trial court's determination that the Coxes failed to meet the elements of unjust enrichment.

¶36 Echoing our economic loss rule analysis above, we note the following additional facts: (1) The DeMers lowered their selling price by $5,000 and paid for three different inspections; (2) the Coxes chose to forgo a presale structural inspection, which likely would have revealed the home's

structural damage and, once revealed, might have provided the Coxes with more bargaining power in negotiating a lower purchase price, assuming they still wanted to purchase the home; and (3) the DeMers were not enriched, unjustly or otherwise, by O'Brien's having compensated the Coxes for repairs necessitated by his failure to discover structural damage to the home during his pest inspection. Again, the Coxes expressly chose to buy the home without first requiring a structural inspection. They cannot now attempt to shift this economic risk, which they expressly assumed under the purchase and sale agreement, to the defendants by claiming unjust enrichment.

¶37 We hold as a matter of law, therefore, that the trial court did not err in dismissing the Coxes' unjust enrichment claim against the DeMers.

### III. ATTORNEY FEES

¶38 The Coxes also contend that, under Mandatory Arbitration Rules (MAR) 7.3 and the indemnification provision, they are entitled to attorney fees for the cost of bringing this appeal. Because the Coxes have not improved their position in bringing this appeal, they are not entitled to attorney fees under MAR 7.3. Nor are they entitled to attorney fees under the so-called "indemnity provision," which does not control here.

¶39 Accordingly, we affirm.

VAN DEREN, C.J., and HOUGHTON, J., concur.

Review denied at 167 Wn.2d 1006 (2009).