IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| PEGGY MONTGOMERY, and DWIGHT MONTGOMERY, and LISA MONTGOMERY, husband and wife, | )<br>)<br>)<br>) |
| Appellants, | )<br>) |
| v. | ) |
| GLEN L. ENGELHARD, JANE DOE ENGELHARD, and their marital community; WILLIAM M. ADAMS, JANE DOE ADAMS, and their marital community; and TB ADAMS REALTY, LLC, a Washington real estate firm, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Respondents. | )<br>) |

No. 31888-5-III

PUBLISHED OPINION

BROWN, A.C.J. – Lisa Montgomery, Dwight Montgomery, and Peggy Montgomery (collectively the Montgomerys) appeal the summary judgment dismissal of their suit for breach of an implied warranty of habitability against Glen Engelhard, Jane Doe Engelhard, William Adams, Jane Doe Adams, and TB Adams Realty, LLC (collectively Mr. Engelhard). The Montgomerys contend material questions of fact remain regarding whether Mr. Engelhard was regularly engaged in

building, whether he had the home built for personal use or for sale, and whether the home was sold to the Montgomerys as a new house. We disagree, and affirm.

FACTS

In 1997, Mr. Engelhard purchased an undeveloped parcel near the Meadow Springs Country Club in Richland. At the time, Mr. Engelhard was a real estate agent and had been involved in the development of "two or three small commercial projects." Clerk's Papers (CP) at 39. In May 1998, the City of Richland issued a building permit to Mr. Engelhard for a single family dwelling on the Richland property. Mr. Engelhard retained Castle Builders as his general contractor. Mr. Engelhard, however, paid the subcontractors directly, because, "it saves on insurance for the builder and it saves, I don't know, bookkeeping time for him, and something else . . . . I do that with the commercial buildings we do too quite often, primarily to prevent mechanics' liens and so forth." CP at 443-44.

The city issued a certificate of occupancy in January 1999. Mr. Engelhard allegedly moved in soon after; the dispute here is whether he actually lived there while claiming the residence as a primary residence for tax purposes. Mr. Montgomery acknowledges Mr. Engelhard appeared to be "living in the upstairs" of the Richland house when Mr. Montgomery met Mr. Engelhard at the house before playing golf in 2001; Mr. Engelhard was "going through his mail and paying bills." CP at 464.

In April 2002, Mr. Montgomery arranged for his mother, Peggy Montgomery, to purchase the house from Mr. Engelhard. The two entered into a purchase and sale

2

agreement. Peggy Montgomery elected not to have an inspection because she "didn't think that it was necessary." CP at 84. In May 2002, Mr. Montgomery and his wife, Lisa, moved in as renters as a favor from Mr. Engelhard. The sale closed in July 2003, and Peggy Montgomery moved into the house in 2004.

In September 2008, the Montgomerys began experiencing problems with pipes breaking, causing water damage throughout the home. In October 2010, they hired an inspector to determine the source of the problem. The inspector "opined the exterior cladding on the home was failing, allowing water intrusion which was causing rot and mold growth." CP at 41. He further noted there was "no vapor barrier under exterior walls." *Id.* A vapor barrier between the foundation and the basement floor prevents ground water infiltration. In October 2010, the Montgomerys vacated the home due to mold growth.

In 2012, the Montgomerys sued Mr. Engelhard as well as TB Adams Realty, LLC, the real estate firm where he worked, and its principal partly alleging breach of contract including breach of the implied warranty of habitability. The Montgomerys' other claims are not in dispute here. The trial court granted Mr. Engelhard's request for summary judgment on the breach of contract/implied warranty. The Montgomerys unsuccessfully requested reconsideration. The parties stipulated to a dismissal without prejudice of certain other claims. The Montgomerys appealed.

ANALYSIS

A. Implied Warranty of Habitability

The issue is whether the trial court erred by summarily dismissing the Montgomerys' breach of the implied warranty of habitability claim. The Montgomerys contend genuine issues of material fact remain as to each element of their implied warranty of habitability claim to preclude summary judgment.

We review an order or denial of summary judgment de novo, performing the same inquiry as the trial court. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). We construe the "facts and all reasonable inferences from the facts in the light most favorable to the nonmoving party." *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). "A material fact is one upon which the outcome of the litigation depends." *Balise v. Underwood*, 62 Wn.2d 195, 199, 381 P.2d 966 (1963). The burden is on the moving party to show no remaining issue of material fact. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). The nonmoving party must specify facts demonstrating a genuine issue of material fact and cannot rest on mere allegations. CR 56(e); *Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wn.2d 127, 132, 769 P.2d 298 (1989). We affirm a summary judgment if no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. CR 56(c); *Huff v. Budbill*, 141 Wn.2d 1, 7, 1 P.3d 1138 (2000).

In Washington, the doctrine of implied warranty of habitability protects the first occupants of residential property against the risk of fundamental defects in the structure

4

of a home. *Stuart v. Coldwell Banker Commercial Grp., Inc.*, 109 Wn.2d 406, 416, 745 P.2d 1284 (1987). Washington adopted the implied warranty of habitability in *House v. Thornton*, 76 Wn.2d 428, 436, 457 P.2d 199 (1969). In *House*, a builder-vendor constructed a house on an unstable site, resulting in severe deterioration of the foundation. *Id.* at 429-31. The court found the builder liable, defining the implied warranty rule as follows, "when a vendor-builder sells a new house to its first intended occupant, he impliedly warrants that the foundations supporting it are firm and secure and that the house is structurally safe for the buyer's intended purpose of living in it." *Id.* at 436. Thus, there are two requisites for an action: the builder-vendor of the dwelling must be a commercial builder and the unit must be built for sale, not as a personal occupancy. *Atherton Condo Apartment-Owners Ass'n. Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 519, 799 P.2d 250 (1990).

*Builder-Vendor.* A "vendor-builder" is "a person regularly engaged in building, so that the sale is commercial rather than casual or personal in nature." *Klos v. Gockel*, 87 Wn.2d 567, 570, 554 P.2d 1349 (1976). The determinative factor is whether the builder is "regularly engaged in building" and, thus, a sophisticated, commercial vendor-builder. *Id.* at 570. Thus, the defendant in a breach of implied warranty of habitability case must be a commercial builder so that the sale is a commercial one, rather than casual or personal in nature. *Id.*

In *Boardman v. Dorsett*, 38 Wn. App. 338, 341, 685 P.2d 615 (1984), the vendor had built the house he sold to the buyer and had built one other house, his family home.

The vendor was not, however, a licensed general contractor. The buyer sued for breach of the implied warranty of habitability. Affirming summary judgment for the vendor, this Court explained, "A commercial builder is a person regularly engaged in building . . . . Mr. Boardman was not a licensed building contractor and had only built one other house-his family home. Since it is clear from the evidence presented that Mr. Boardman was not a commercial builder, no factual dispute existed and the court did not err in granting summary judgment on this issue." *Id.* at 341-42.

Here, Mr. Engelhard happened to be a licensed real estate agent who had been involved in "two or three small commercial projects" in the past. CP at 39. He was not a licensed building contractor. For the Richland home, Mr. Engelhard hired Castle Builders as general contractor for the home's construction. If a builder like the *Boardman* defendant could not be a commercial builder, a vendor like Mr. Engelhard, who did not build the house but instead hired a general contractor, cannot be either.

Relying on *House*, the Montgomerys argue a vendor who hires a contractor to construct a home can nevertheless be subject to the implied warranty of habitability. But, there, the defendant real estate broker and his general contractor had "entered into a *copartnership and agreement* to construct" the residence. *House*, 76 Wn.2d at 429 (emphasis added). Under the law then in effect, the partnership was bound by one partner's wrongful act, and each partner was jointly and severally liable therefor. 1955 WASH. LAWS ch. 15, §§ 25.04.130, .150(1). Thus, in *House*, the conduct of the general contractor was imputable to his partner, the real estate broker, as a matter of law.

6

In general, non-builder developers and vendors typically retain general contractors to do the actual construction because the vendors lack building expertise. This may explain why Washington courts have limited the applicability of the implied warranty of habitability to vendor-builders.

Summary judgment is proper if reasonable minds could reach but one conclusion from the evidence. *Bostain v. Food Express*, 159 Wn.2d 700, 708, 153 P.3d 846 (2007). Because Mr. Engelhard did not have a builder's license, was not an experienced developer, and was not regularly engaged in building, reasonable minds could reach but one conclusion; he was not the builder-vendor of the Richland home. Thus, the Montgomerys failed to create a genuine issue of material fact on a critical and dispositive element of a breach of the implied warranty of habitability claim; the trial court properly granted summary judgment.

*New Home Built for Sale.* Without a genuine issue of material fact over whether Mr. Engelhard was a builder-vendor, we need not reach the remaining issue of whether it was a new house built for sale. Nevertheless, we note, an implied warranty does not attach merely because "the [vendor] contemplated an eventual sale." *Klos*, 87 Wn.2d at 570. "[T]he sale must be fairly contemporaneous with completion and not interrupted by an intervening tenancy unless the builder-vendor created such an intervening tenancy for the primary purpose of promoting the sale of the property." *Id.* at 571. What constitutes a "new house" is a question of fact; while the passage of time will "cancel

7

[implied warranty] liability, but just how much time need pass varies with each case." *Id.* at 571.

Here, the city certified the house for occupancy in 1999. Mr. Engelhard claims he then moved into the home. In 2001, Mr. Montgomery visited Mr. Engelhard at the home and he appeared to be living there. Peggy Montgomery and Mr. Engelhard entered into a purchase and sale agreement in 2002. Mr. Montgomery and his wife then moved in as renters. The house sale closed in 2003, and in 2004, Peggy Montgomery moved in, joining her son and daughter-in-law.

Based on the passage of time and Mr. Engelhard's residency at the home, reasonable minds could reach but one conclusion that the house was not built for an occupant other than Mr. Engelhard and, thus, was not a new home when Peggy Montgomery purchased the home. Many homeowners build houses contemplating eventual sale. But for the house to meet the requirement that it was built for the purpose of sale, the sale must be fairly contemporaneous with completion of construction and not interrupted by an intervening tenancy unless that tenancy was primarily to promote the sale. The implied warranty applies only to benefit first occupants of new homes. Plaintiffs were not first occupants. The home was not new. Summary judgment was proper. Accordingly, the trial court did not err in dismissing the Montgomerys' claim for breach of an implied warranty of habitability.

8

## B. Attorney Fees

Both parties request attorney fees on appeal under paragraph 16 of their purchase and sale agreement, providing "If the Buyer, Seller, or any real estate licensee or broker involved in this transaction is involved in any dispute relating to this transaction, any prevailing party shall recover reasonable attorney fees and costs (including those for appeals)." CP at 68. Because Mr. Engelhard prevails here, he is entitled to attorney fees on appeal subject to compliance with RAP 18.1(d).

Affirmed.

Brown, A.C.J.

31888-5-III

LAWRENCE-BERREY, J. (concurring in result) — Glen Engelhard, citing RCW 4.16.300 through .320, argued in his opening summary judgment memorandum that Peggy Montgomery's claims all accrued more than six years after substantial completion, i.e., issuance of the January 1999 occupancy permit, and are thus barred by the "statute of limitations." In response, Ms. Montgomery argued that the "statute of repose" applies only to builders, and her implied warranty of habitability claim against Mr. Engelhard was based solely on his status as a seller. The trial court did not resolve this issue that clearly was raised and responded to by the parties. Nor, on appeal, did Mr. Engelhard argue that this was an independent basis for us to affirm the trial court's summary judgment dismissal.

Nevertheless, "[w]e may affirm summary judgment on any theory established and supported by the moving party, even if it is not the basis relied upon by the trial court . . . so long as it is 'established by the pleadings and supported by the proof.'" *Skyline Contractors, Inc. v. Spokane Hous. Auth.*, 172 Wn. App. 193, 200, 289 P.3d 690 (2012) (quoting *Lamon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989)). Here, although termed a "statute of limitations" by Mr. Engelhard, Ms. Montgomery showed

her understanding of the issue raised by correctly denoting the authority as a "statute of repose" and by responding to the argument. The statute of repose, therefore, was sufficiently established by the pleadings and serves as an independent basis for our review and possible affirmance of the trial court's summary judgment dismissal.

RCW 4.16.300 applies to "all claims or causes of action of any kind against any person, arising from such person having constructed . . . or supervis[ed] or observ[ed] . . . construction . . . of any improvement upon real property." The statute expresses its intent as applying to persons who "*must be registered or licensed*" to improve real property. RCW 4.16.300 (emphasis added). In turn, RCW 4.16.310 bars "[a]ll claims or causes of action as set forth in RCW 4.16.300" that do not accrue during the period within six years after substantial completion of construction. The statute defines "substantial completion of construction" as when the structure "may be used or occupied for its intended use." RCW 4.16.310.

The implied warranty of habitability applies only to builder-vendors. This is a conjunctive, not a disjunctive, label. That is, to establish liability under the implied warranty of habitability, the plaintiff must establish that the defendant is both a builder and a vendor. Ms. Montgomery's argument that she is not suing Mr. Engelhard as a builder, but only as a vendor, is disingenuous. As correctly acknowledged by the dissent, for Mr. Engelhard to be a builder-vendor, he must come within the definition of being a

2

registered contractor. Therefore, the intent of the statute of repose would best be implemented by extending its protections to a builder-vendor.

Having established that liability under the implied warranty of habitability is limited by the statute of repose, we need only observe the obvious undisputed fact that Ms. Montgomery's claims did not accrue until September 2008, more than six years after issuance of the occupancy permit. I would limit our affirmance of the lower court's summary judgment dismissal to this issue and not determine whether Mr. Engelhard is a builder-vendor for summary judgment purposes. *See Spokane County v. Miotke*, 158 Wn. App. 62, 69, 240 P.3d 811 (2010) ("'principles of judicial restraint dictate that when one issue is dispositive, we should refrain from reaching other issues that might be presented'") (quoting *Christiano v. Spokane County Health Dist.*, 93 Wn. App. 90, 94, 969 P.2d 1078 (1998)).

Lawrence-Berrey, J.

3

31888-5-III

FEARING, J. (dissenting) — The facts presented in the radiance most advantageous to Peggy Montgomery include facts that could establish all elements of a claim for implied warranty of habitability against her home's seller, Glen Engelhard. Facts and inferences therefrom could lead a trier of fact to conclude that Engelhard was a commercial seller; Engelhard built the home with a sale to a third party in mind; Peggy Montgomery was the first purchaser of the residence; and the home remained a new home upon Montgomery's purchase. The equities presented by the case also fulfill the purposes behind the cause of action for implied warranty of habitability. Peggy Montgomery deserves an opportunity to present her evidence to a trier of fact. Therefore, I dissent.

## FACTS

The lead opinion's version of the facts misses the richness of the case's facts and avoids the evidentiary nuances that create issues of fact. This dispute involves the 2003 sale of a home at 625 Meadows Drive South, Richland, by defendant Glen Engelhard to plaintiff Peggy Montgomery. Glen Engelhard and plaintiff Dwight Montgomery were golfing friends. Peggy Montgomery is the mother of Dwight. Lisa Montgomery is Dwight's wife. Dwight and Lisa Montgomery lived in the home along with Peggy.

Glen Engelhard is a licensed real estate agent and a real estate developer. At one time, Engelhard held a real estate broker's license. As a realtor, he sold both commercial and residential real estate. Before the construction of the Meadows Drive home, Engelhard built, as the owner, three commercial properties: a Sylvan Learning Center, a Smith Barney office building, and a Quizno's restaurant. Engelhard also purchased two preexisting homes so that a friend could remodel, update, and resell the homes. Engelhard and the friend split the profits on the resale. Glen Engelhard also developed a subdivision, Country View Estates. He is uncertain if that development occurred before or after the construction of the Meadows Drive residence.

In 1997, Glen Engelhard purchased 625 Meadows Drive South, then a vacant lot near the fashionable Meadow Springs Country Club. The lot lay in an upscale neighborhood. When asked in his deposition what he intended to do with the vacant land upon purchase, Engelhard first responded: "build a house." He immediately changed his answer to "have a house built."

Q. What did you want to do with that piece of dirt?
A. Build a house. Have a house built, excuse me.

Clerk's Papers (CP) at 54.

Glen Engelhard and Dwight Montgomery occasionally golfed together at the Meadow Springs Country Club. During one golf outing, Engelhard informed Montgomery that he purchased the lot at 625 Meadows Drive. Engelhard bragged that

2

the lot was the last vacant site on the golf course and that he intended to build a home on it. Montgomery jokingly said something to the effect of "congratulations, it sounds like you are building a home to settle down, get married and raise a family." Engelhard responded "not a chance" and added something to the effect of "I'm building the home to sell it and take advantage of the tax savings." CP at 463. Montgomery did not understand what Engelhard meant by a tax savings and asked Engelhard to explain. Engelhard elucidated that he would build the home and live there or at least get his mail there for two years before selling it. Montgomery still did not understand Engelhard's comments because Engelhard lived in a condominium along the fourth fairway of the Meadow Springs golf course. Engelhard further explained that, if he at least received his mail at the 625 Meadows house, he could claim the home as his primary residence, and, upon selling the home, he could roll the entire selling price into his next property without paying any income taxes. Engelhard further explained that, by using this strategy, he could save fifteen percent per house. Because of the tax savings and his acting as his own general contractor, Engelhard would be mortgage free after selling the third house.

During this golf course conversation, Dwight Montgomery asked Glen Engelhard how many employees the latter's construction company had, and Engelhard said "zero, I use subcontractors." CP at 463. Montgomery wondered and asked how one can build a house without a construction company. Engelhard replied: "[Y]ou can't, but I have a guy that my dad and I are doing a deal with who is letting me use his contractor's license."

3

CP at 464. Engelhard also said that he would build a Parade of Homes home so that he could procure high end materials at a discount from the suppliers and manufacturers.

Glen Engelhard ordered architectural plans out of a book for use in the construction of the Meadows Drive home. He took the plans to an architect to rework in order to add a basement and a roof for a patio to the new house. The City of Richland issued a construction permit, on May 18, 1998, for Engelhard to build a single family dwelling on the lot.

Glen Engelhard hired Bruce Schmidt, d/b/a Castle Builders, to construct the new home. Engelhard had sold about ten of Bruce Schmidt's homes before Schmidt built the 625 Meadows Drive home. Engelhard viewed Schmidt as the general contractor for the project. Engelhard did not consider himself the builder of the home, in part, because he "didn't know what [he] was doing." CP at 55. Engelhard, however, paid all subcontractors directly in order to save insurance premiums and bookkeeping time for the builder. He also paid subcontractors directly to prevent mechanics' liens. According to Schmidt, Engelhard directly hired subcontractors and purchased materials for the home.

Glen Engelhard hoped to show the 625 Meadows Drive residence during the Tri-Cities Parade of Homes. The Parade of Homes showcases new homes located throughout the Tri-Cities area. Each home is unique in design and style and features the latest in architectural trends and the best in workmanship. The Parade provides exposure to the public for builders, subcontractors, and sales professionals. Bruce Schmidt did not

4

complete construction on time to display the home on the Parade.

During construction of the Meadows Drive home, Glen Engelhard frequently observed the progress. In his words, he was "involved in the whole process." CP at 427. During the construction, he chose tiles, granite countertops, carpet, and other accoutrements. Engelhard occasionally hosted the work crew for drinks. Bruce Schmidt was unaware that Engelhard directed any of the work crew. Nevertheless, Engelhard admitted he directed the crew to make changes in the design without informing Schmidt.

The City of Richland issued a certificate of occupancy for the Meadows Drive home on January 8, 1999. The upstairs comprised a kitchen, pantry and laundry, living room with a dining area, two bedrooms, a playroom, and two bathrooms. The basement included two bedrooms, a small kitchen, laundry closet, two bathrooms, a utility room, a den, and a storage area.

Thereafter, Glen Engelhard used 625 Meadows Drive, at least in part, for a year and a half to two years. On one day in 2001, Dwight Montgomery saw Engelhard appear to be "living in the upstairs" of the house, when Montgomery met Engelhard at the house before playing golf. CP at 464. Engelhard reviewed mail and paid bills before the round of golf. Engelhard claimed the residence as a primary residence for tax purposes. He was aware that living in a home for two years garnered tax advantages.

During Dwight Montgomery's 2001 visit to the home, the two again discussed Engelhard's serial home building plan. Glen Engelhard told Montgomery that he found

the next lot on which to build the second home in his plan. Montgomery replied: "cool, where are you moving," and Engelhard answered that he found a lot near the Cathedral of Joy, Montgomery's home church. CP at 464.

Glen Engelhard marketed 625 Meadows Drive by placing it on the Multiple Listing Service, erecting signs, advertising in a real estate magazine, and preparing and distributing a flyer. Engelhard does not know when he placed the home on the market or how long the home remained on the market.

In September 2001, realtor Sam Volpentest showed Janice and John Fulton the home at 625 Meadows Drive South. The couple observed standing water in the basement utility room. They also detected water marks on the walls in basement rooms. All of the baseboard trim was missing in the basement, and all of the basement carpet was new. The Fultons were told that the basement carpet had been replaced because the basement had been rented to single young men who damaged it. The couple also saw bugs throughout the basement which alerted them to the presence of excessive moisture.

Glen Engelhard did not inform Peggy Montgomery or her son of the problems observed by the Fultons. Montgomery would not have purchased the home if she knew of the Fultons' experience in encountering a musty smell and of Engelhard taking steps to clean the smell. Engelhard denies replacing the carpet or any problems with water intrusion before the sale to Peggy Montgomery.

After completing the Meadows Drive home but before Glen Engelhard moved

6

from the residence, Bruce Schmidt built another home for Engelhard at 464 Anthony Drive, in another glamorous neighborhood of Richland. The home lies on a lot near the Cathedral of Joy, earlier mentioned by Engelhard to Dwight Montgomery. Engelhard showed the Anthony home in the Parade of Homes. Engelhard lived in the home for two years and then sold it. And again, Engelhard, not Schmidt, paid all bills arising from construction of the Anthony Drive home, and Engelhard hired subcontractors for the building of the home.

Glen Engelhard does not recall to where he moved after living in the Anthony Drive home. During the years, he owned "a couple" of condominiums along the Meadow Springs golf course. CP at 431. Engelhard has lived in eight different houses along the golf course. He also owned a residence at 4800 West 19th Street, in Kennewick, and even temporarily resided in Scottsdale, Arizona, and Bend and Salem, Oregon.

At an unknown date, Glen Engelhard informed his friend, Dwight Montgomery, of the availability of 625 Meadows Drive for sale, and Engelhard gave Montgomery a tour of the home. Montgomery was interested but lacked the financial strength to purchase the home. Montgomery contacted his mother about purchasing the home and she expressed a willingness. In April 2002, Dwight Montgomery negotiated with Glen Engelhard toward the goal of Dwight's mother, Peggy, purchasing the Meadows Drive home. Peggy Montgomery expected her son to occupy the home with her.

On April 30, 2002, Peggy Montgomery and Glen Engelhard entered into a

7

purchase and sale agreement, under which Montgomery agreed to purchase the home for $360,000. In the earnest money agreement, Engelhard disclosed that he was a licensed realtor, but only represented himself in the transaction. Engelhard made no representations other than the property being connected to certain utilities. The sale was to close by July 18, 2003, more than one year in the future.

Near the time of the entry of the earnest money agreement, Glen Engelhard attended Dwight and Lisa Montgomery's wedding, and, at the wedding, announced to the newlyweds that he would allow them to move early into the Meadows Drive home. Dwight and Lisa moved into the home as renters in May 2002.

According to Dwight Montgomery, he and his mother did not engage a professional inspector because his mother had never had an inspection of a home before and she never encountered problems with a home. Also, Dwight Montgomery considered Glen Engelhard a successful developer who would build a quality home. He and Engelhard were close friends. Peggy Montgomery confirmed she elected not to have an inspection because she "didn't think that it was necessary." CP at 84. Engelhard does not believe a home inspection would have led to the discovery of any of the defects later alleged by Peggy Montgomery.

The sale closed on July 11, 2003. Peggy Montgomery moved into the home in 2004 and lived in the basement. She also lived part time in Georgia. After the closing of the sale of 625 Meadows Drive, Dwight Montgomery occasionally smelled must in the

8

residence's basement. The odor grew stronger.

Beginning in 2008, Dwight Montgomery noticed water damage in the Meadows Drive home. In June 2008, he observed damage in the ceiling of the southeast basement bedroom and mold stains on the bottom of a floor joist in the north wall of the southwest basement bedroom. Montgomery saw cracks in the sheetrock in the basement stairway, in the kitchen, and around the fireplace mantle. Cracks formed in the stamped concrete of the home's sidewalk and driveway. In September 2008, Dwight Montgomery detected a leak in the southwest basement bedroom wall originating from the master bedroom shower valve connection. In November 2008, he observed a Pella bay window leaking, which caused water damage to a window seat and exterior sheathing.

Ongoing construction in the neighborhood of the Meadows Drive home included compaction of soils. Peggy and Dwight Montgomery wondered if compacting vibrations caused damage to their home and they notified the home insurer, Mutual of Enumclaw, of a possible claim. Thereafter, Mutual of Enumclaw and Peggy Montgomery hired numerous experts to inspect the home. Those experts included Trenary & Associates, LLC; Len Harms of Harms Engineering, Inc.; Jeff Harris of CASE Forensics; Michael Black of Columbia Engineers and Constructors, LLC; Jim Bertsch of Ashley-Bertsch, a general contractor; and Susan Evans of MDE, Inc., a forensic engineering company.

The universal conclusion of the many inspectors was that the neighboring compaction caused no damage to the home. Rather, they concluded that the builder

poorly constructed the Meadows Drive home. The principal construction defect was the lack of a vapor barrier at the lower level concrete floor slab, among other areas. A vapor barrier or retarder is any material that resists diffusion of moisture through walls, ceilings and floors of buildings. A vapor barrier between the foundation and the basement floor would have prevented ground water infiltration.

The Meadows Drive home also lacked a sufficient vapor barrier around the outside walls. The home was clad in an "exterior insulation and finish system" (EIFS). An EIFS is an exterior wall that combines an insulated finished surface with waterproofing. The Meadows Drive home lacks a drainage plane behind the EIFS to allow release of moisture that enters the wall without the wetness impacting the wall's substrate. Without the drainage plane in the 625 Meadows Drive home's EIFS, the sheathing or siding on the house readily deteriorated and rotted when exposed to long term water infiltration. Inspector Susan Evans found bulging, stress line cracks, and dryrot sheathing behind the EIFS. Evans also noticed bowing columns and dry rot in beams and columns. The home's deck also lacked sufficient waterproofing. Susan Evans concluded that the deck was vulnerable to continued and accelerated deterioration, both aesthetically and structurally. Inspector Jeff Harris noted that the columns and fascia on the west elevation that support the main floor deck were cased with EIFS. According to Harris, the open wood decking extended directly over the top edge of the EIFS, creating a path for water to enter the home. The transition between the wood deck and EIFS was inherently

10

defective and did not meet industry standards for installing an EIFS system. The transition between the deck and the fascia, on the one hand, and the EIFS-cased beam, on the other hand, failed to meet code requirements. Water entering the structure from the wood deck resulted in delamination of the EIFS and deterioration of the deck.

According to Susan Evans, the home's plumbing also encountered excessive leaks. Finally, Evans found that the builder incorrectly installed the bay windows and failed to include flashing mentioned in the window manufacturer's manual. According to Jeff Harris, the transition between the roof and the bay windows failed to meet building code requirements and led to leaking around the window.

Inspector Michael Black found that 625 Meadows Drive lay adjacent to a wetland and the lot's water table sat six feet below the home's basement floor. In turn, the home lacked "damproofing" common to accepted construction practices. CP at 300. Black measured elevated humidity in the basement resulting from long term water infiltration through the concrete slab floor and foundation walls resulting in mold. He found the home's wood to be in an advanced state of deterioration. The construction of the home failed to provide required and appropriate measures to resist moisture penetration into the basement area.

Michael Black concluded that repairing the mold damage and renovating the house to prevent later water intrusion would be costly and disruptive. Renovation would entail removal of the entire basement concrete floor along with six inches of soil,

11

installation of four inches of crushed gravel, positioning of a vapor retarder that meets code requirements, installation of an additional two inches of free-draining sand or crushed gravel over the vapor retarder, provision of peripheral venting, and installation of a foundation drain system. Susan Evans noted that, since the concrete floor slab is already cracked and heaved, the slab must be replaced and reinstalled, with proper drainage and a vapor barrier in place before concrete is again poured.

Jim Bertsch of Ashley-Bertsch opined that the cost to repair the home was $303,300. According to Dwight Montgomery, cleaning of the mold alone would cost $69,486.84.

As a result of water intrusion into the home, the house garnered microbial volatile organic compounds, the by-product of fungal and bacterial metabolism in deteriorating wood. The compounds are vapors, not particles, and they migrate through air exchanges in the home. In October 2010, Peggy, Dwight and Lisa Montgomery evacuated the home due to the mold. The house remains unoccupied.

## LAW AND ANALYSIS

### *Summary Judgment Rules*

A review of familiar summary judgment principles is as important to this appeal as a discussion of the substantive law of home purchases. Appellate courts review a trial court's order granting summary judgment de novo. *Briggs v. Nova Servs.*, 166 Wn.2d 794, 801, 213 P.3d 910 (2009). Summary judgment is appropriate if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c). A material fact is one on which the outcome of the litigation depends in whole or in part. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008); *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974). In a summary judgment motion, the burden is on the moving party to demonstrate that there is no genuine issue as to a material fact and that, as a matter of law, summary judgment is proper. *Hartley v. State*, 103 Wn.2d 768, 774, 698 P.2d 77 (1985).

A principal difference between the lead opinion and this dissent is the lead opinion writes the facts with a viewpoint favorable to the nonmoving party, Glen Engelhard. Nevertheless, under summary judgment principles, this court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *Barber v. Bankers Life & Cas. Co.*, 81 Wn.2d 140, 142, 500 P.2d 88 (1972); *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

The lead opinion's error is mostly one of omission in that the lead opinion spurns much of Peggy Montgomery's evidence. I will later detail crucial testimony that the lead opinion snubs. However, the lead opinion's error is also one of commission by uncritically accepting Glen Engelhard's version of the facts. For example, the lead author writes: "Peggy Montgomery elected not to have an inspection because she 'didn't

13

think it was necessary.'" Lead opinion at 3. Whether the buyer of the home hires an expert to perform an inspection before the purchase is immaterial to whether the implied warranty of habitability attaches to the sale. The purpose for inserting this fact into the opinion may be to belittle Montgomery's claim. Nevertheless, the lead opinion omits mention of Glen Engelhard's testimony that an inspection would not have caught the lack of a vapor shield, the principal construction defect at issue.

A party may not have its affidavits considered at face value. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986); *Seiber v. Poulsbo Marine Ctr., Inc.*, 136 Wn. App. 731, 736, 150 P.3d 633 (2007). Although this principle is usually applied to affidavits submitted by the nonmoving party, the principle should apply with equal, if not added, force to the moving party, since the moving party bears the burden of showing the lack of a genuine issue of material fact.

The lead opinion accepts Glen Engelhard's position that he resided at the 625 Meadows Drive home. Nevertheless, testimony of Dwight Montgomery could lead a trier of fact to conclude Engelhard's profession of the Meadows Drive residence as his principal residence was a ruse. Montgomery saw Engelhard open mail at the dwelling, but he also heard Engelhard state that he could claim the residence as his principal home by using the home as a mail depositary. Montgomery testified that Engelhard appeared to live at the home, but the appearance could have been a charade. No one testified that Engelhard ever spent the night at the residence. Engelhard owned other homes along the

14

golf course and informed Dwight Montgomery that he could claim the Meadows Drive home as his residence by retrieving his mail from the home.

Experience tells us that individuals claim homes as a principal residence when they live almost full time somewhere else. Indeed, Kansas Senator Pat Roberts claimed a supporter's Dodge City home to be his principal residence despite his spending most of his days and nights in a Virginia home. *See* Jonathan Martin, *Lacking a House, a Senator is Renewing His Ties in Kansas*, N.Y. TIMES, Feb. 8, 2014, at A11. Regardless, the conflicting testimony of Dwight Montgomery and Glen Engelhard creates, at minimum, a genuine issue of material fact that precluded the trial court from granting summary judgment to Engelhard.

### Implied Warranty of Habitability

With summary judgment principles in mind, I now address the substance of Peggy Montgomery's claim. The only issue on appeal is whether sufficient facts defeat Glen Engelhard's summary judgment motion to dismiss Montgomery's claim for breach of the implied warranty of habitability.

Under the common law, the buyer could not recover damages from the seller for dwelling defects that rendered the property unfit for ordinary purposes, unless the seller actively concealed latent defects or otherwise made material misrepresentations amounting to fraud. The shorthand word for this common law principle is caveat emptor, Latin for "Let the buyer beware."

15

American jurisdictions have increasingly recognized the unfairness and unrealistic underpinnings to caveat emptor in new home sales. *See* Annotation, *Liability of Builder-Vendor or Other Vendor of New Dwelling for Loss, Injury, or Damage Occasioned by Defective Condition Thereof,* 25 A.L.R. 3d 383 (1969). The modern trend in the United States is to recognize an implied warranty of habitability or fitness that applies to the sale of new residential housing by a builder-seller, while the caveat emptor rule applies to all other home sales. *McDonald v. Mianecki,* 79 N.J. 275, 283-91, 398 A.2d 1283 (1979); *Humber v. Morton,* 426 S.W.2d 554, 557-62 (Tex. 1968). The Montana Supreme Court rent the foundation of the doctrine of caveat emptor in this setting when it wrote in *Chandler v. Madsen,* 197 Mont. 234, 238, 642 P.2d 1028 (1982):

> Caveat emptor, which traditionally has applied to sales of real estate, developed at a time when a buyer and seller were in equal bargaining positions. They were of comparable skill and knowledge and each could protect himself in a transaction.
> In the modern marketplace that equality of position no longer necessarily exists.

The rule of the implied warranty of habitability brings the law much closer to the realities of the market for new homes than does the anachronistic maxim of caveat emptor. *Gable v. Silver,* 258 So.2d 11, 17 (Fla. Dist. Ct. App. 1972).

Washington courts concur that the rule of caveat emptor—premised as it is on an arm's length transaction between buyers and sellers of comparable skill and experience—has little relevance when applied to the sale of new homes in today's market. *Frickel v.*

*Sunnyside Enters., Inc.*, 106 Wn.2d 714, 719, 725 P.2d 422 (1986). In *House v. Thornton*, 76 Wn.2d 428, 457 P.2d 199 (1969), the Washington Supreme Court adopted an implied warranty of habitability for the sale of new residential dwellings by builder-vendors. The *House* court stated:

> [W]hen a vendor-builder sells a new house to its first intended occupant, he impliedly warrants that the foundations supporting it are firm and secure and that the house is structurally safe for the buyer's intended purpose of living in it.

76 Wn.2d at 436. The implied warranty of habitability fixes liability for defective construction on the builder-vendor, rather than the purchaser, because the former's position throughout the construction process is markedly superior to that of the purchaser, and because the builder-vendor has a far better opportunity to avoid the alleged defect. *House*, 76 Wn.2d at 435. A purchaser has a right to expect to receive that for which he has bargained and that which the builder-vendor has agreed to construct and convey to him, that is, a house reasonably fit for use as a residence. *Frickel v. Sunnyside Enters., Inc.*, 106 Wn.2d at 719-20 (1986) (quoting *Petersen v. Hubschman Constr. Co.*, 76 Ill.2d 31, 40, 389 N.E.2d 1154 (1979)).

The Uniform Commercial Code imposes an implied warranty on the sale of goods. There is no rational doctrinal basis for differentiating between the sale of a newly constructed house by the commercial builder and the sale of any other manufactured product. *Rothberg v. Olenik*, 128 Vt. 295, 305, 262 A.2d 461 (1970). A house is usually

17

the most expensive single purchase an individual or family makes, and often costs several

times the annual household income. Owning a new home is part of the American dream.

For these reasons, imposing an implied warranty on the sale of a new home is wiser than

attaching the warranty to a sale of goods.

Our high court, in *Frickel v. Sunnyside Enterprises, Inc.*, 106 Wn.2d at 717 wrote:

> As a matter of policy, determined by this court, it seems apparent
> that a builder who puts a house on the market, brand new and never
> occupied, has some responsibility to the ultimate buyer. The builder built
> the thing. It was intended to be sold to a buyer for occupancy by the
> buyer—not as an assemblage of concrete and pieces of wood, but as a
> residence. It is no different from the manufacturer of an automobile. The
> auto should run down the road without wheels falling off and new houses
> should provide habitation without foundations falling apart.

Similarly, the Illinois Supreme Court wrote:

> Many new houses are, in a sense, now mass produced. The vendee
> buys in many instances from a model home or from predrawn plans. The
> nature of the construction methods is such that a vendee has little or no
> opportunity to inspect. The vendee is making a major investment, in many
> instances the largest single investment of his life. He is usually not
> knowledgeable in construction practices and, to a substantial degree, must
> rely upon the integrity and the skill of the builder-vendor, who is in the
> business of building and selling houses. The vendee has a right to expect to
> receive that for which he has bargained and that which the builder-vendor
> has agreed to construct and convey to him, that is, a house that is
> reasonably fit for use as a residence.

*Petersen v. Hubschman Constr. Co.*, 76 Ill.2d at 40.

Glen Engelhard does not challenge Peggy Montgomery's claim that the home's

lack of vapor shields and the resulting mold are defects covered by the implied warranty

18

of habitability. *House v. Thornton* and its progeny grant recovery for egregious, fundamental defects in homes, which, as the name of the warranty indicates, render the house unfit for habitation. *Stuart v. Coldwell Banker Commercial Grp., Inc.*, 109 Wn.2d 406, 415, 745 P.2d 1284 (1987); *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 520, 799 P.2d 250 (1990). In *Gay v. Cornwall*, 6 Wn. App. 595, 494 P.2d 1371 (1972), the court extended the implied warranty to a house that suffered from numerous water leaks, despite the cost to repair being only $2,000. The defect in Peggy Montgomery's home lay in the home's structure failing to prevent water intrusion. That intrusion rendered the home unhealthy and uninhabitable.

Under Washington case law, four prerequisites must exist for the implied warranty of habitability to arise from the sale of a new residential dwelling. First, the vendor of the dwelling must be a commercial builder. *Frickel v. Sunnyside Enters., Inc.*, 106 Wn.2d at 718; *Klos v. Gockel*, 87 Wn.2d 567, 570, 554 P.2d 1349 (1976); *Boardman v. Dorsett*, 38 Wn. App. 338, 341, 685 P.2d 615 (1984); *Allen v. Anderson*, 16 Wn. App. 446, 448, 557 P.2d 24 (1976). Second, the unit must be built for sale, rather than personal occupancy. *Frickel*, 106 Wn.2d at 718; *Klos*, 87 Wn.2d at 570; *Luxon v. Caviezel*, 42 Wn. App. 261, 265, 710 P.2d 809 (1985). Third, the home must be new. *Frickel*, 106 Wn.2d at 718; *Klos*, 87 Wn.2d at 570; *Carlile v. Harbour Homes, Inc.*, 147 Wn. App. 193, 200-01, 194 P.3d 280 (2008). Fourth, the injured party must be the first occupier-purchaser. *Carlile*, 147 Wn. App. at 201. The prerequisites overlap such that

19

analyzing one element entails also addressing one or more other elements.

*Commercial Builder*

I now begin my scrutiny of whether Peggy Montgomery presents evidence to support the four elements comprising the implied warranty of habitability. The implied warranty does not apply to every sale of a new house. *Frickel v. Sunnyside Enters., Inc.*, 106 Wn.2d at 718 (1986). The sale must be "commercial rather than casual or personal in nature." *Klos v. Gockel*, 87 Wn.2d at 570. The seller must be a commercial builder, defined in part as "a person regularly engaged in building." *Klos*, 87 Wn.2d at 570; *Boardman v. Dorsett*, 38 Wn. App. at 341 (1984). No Washington case further defines what qualifies as "regularly engaged in building."

In *Boardman v. Dorsett*, 38 Wn. App. 338 (1984), the Dorsetts purchased a home from Wesley Boardman. Boardman built the home on a lot owned by him. The decision gives no further information about the background of Boardman. The Dorsetts claimed that an implied warranty of habitability attached to the home. This court disagreed as a matter of law. While the Dorsetts alleged Boardman was a commercial builder, they failed to offer any factual proof of the allegation. Wesley Boardman's deposition established that he was not a licensed building contractor and had only built one other house—his family home.

In this appeal, the lead opinion emphasizes Glen Engelhard's lack of a contractor's license. The lead opinion implies that the lack of a license establishes as a matter of law

20

that Engelhard is not a commercial builder for purposes of the warranty of habitability.

In *Boardman v. Dorsett*, this court mentioned that Wesley Boardman lacked a

contractor's license, but did not expressly hold that a builder must be licensed before he

is a commercial builder for purposes of the warranty. Nor should it have. Such a rule

would be problematic when a builder unlawfully fails to obtain the license and could

allow an "off the books" builder to avoid liability for a shoddily built home.

In *House v. Thornton*, 76 Wn.2d 428, 457 P.2d 199 (1969), Washington's leading

case on the implied warranty of habitability, the court imposed liability on a real estate

broker who purchased three vacant lots and built, with the help of a contractor, houses on

two of the lots. The lead opinion in this appeal emphasizes that the realtor in *House*

entered into a partnership with the contractor, a fact absent in the relationship between

Glen Engelhard and Bruce Schmidt, the builder of the Montgomery home. Nevertheless,

the Supreme Court, in *House v. Thornton*, did not expressly hold the realtor liable

because of his partnership with the builder. The court treated the real estate broker as the

builder. There was no mention of the realtor possessing a contractor's license.

At least one foreign decision bolsters my dissent. In *Bolkum v. Staab*, 133 Vt.

467, 346 A.2d 210 (1975), the Vermont high court affirmed a trial court's award of

damages for defective construction items in a dwelling house. Defendant John Staab

owned a large tract of land, carved into building lots. Staab, while retaining title to one

lot, contracted with a builder to construct a house on the lot and Staab showed the home

21

to the Bolkums when it was almost complete. Staab claimed the rationale behind the implied warranty did not apply to him because he did not construct the house, but rather hired a contractor to build the home. He argued on appeal that the implied warranty against structural defects in the sale of a newly constructed house should not apply when the seller is not the builder and does not "control" the builder. The trial court found that Staab exercised "no real control" over the construction done by the builder. The Vermont Supreme Court reversed, reasoning that the trial court must have equated "real control" with actual control, as exercised by an employer over an employee, rather than the general control exercised by an owner over an independent contractor.

The *Staab* court distinguished its facts from the instance when an owner hires a contractor to build a house for the owner's own use and later decides to sell it. The facts presented on appeal were different. John Staab caused the house in question to be built expressly for resale and as part of a development plan. The sale was commercial in nature, not casual or personal. That Staab did not personally drive the nails had no effect on the principle involved, any more than it did in the case of the sale of chattels. The implied warranty arises from the business of selling, rather than the business of manufacture.

Similarly here, numerous facts and the inferences therefrom could lead a trier of fact to reasonably conclude that Glen Engelhard was a commercial seller. In viewing the facts in a glow favorable to Engelhard, rather than the Montgomerys, the lead opinion

22

disregards these facts. Glen Engelhard is a licensed real estate agent and, at least at one time, a licensed broker. He purchased two preexisting dwellings, and, with a friend performing the remodeling, Engelhard updated the homes and resold them for a profit. Engelhard also developed a subdivision. Therefore, he should have more familiarity with house construction than the layperson.

Before constructing 625 Meadows Drive, Glen Engelhard built, as the owner, three commercial properties. Framing, siding, and water intrusion prevention has similarities in residential and commercial buildings. No court decision excludes a builder's experience as a builder of commercial structures from the reckoning of whether someone is a commercial builder for purposes of the residential implied warranty. Moreover, the erection of other residential properties occurred after the construction of the Meadows Drive home, but no court decision precludes the application of the implied warranty of habitability to a commercial builder's first constructed home. The record confirms that Engelhard built at least one other home and the inferences are that Engelhard built at least four residences.

Bruce Schmidt, the licensed builder, did not exclusively assume the role of general contractor at 625 Meadows Drive. Glen Engelhard also acted as a general contractor. Engelhard directly hired subcontractors and purchased materials for the home. He paid all subcontractors directly. During construction of the home, Engelhard directed the crew to make changes in the design without informing Schmidt. In addition, Glen Engelhard

23

told Dwight Montgomery that he acted as his own general contractor. In assessing the evidence in an illumination most positive to Engelhard, the moving party, rather than recognizing these conflicting accounts of the parties' actions and intentions as giving rise to a genuine issue of material fact, the lead opinion misapplies the summary judgment standard.

Assuming for argument's sake that the defendant's licensure as a contractor is a predicate to liability under an implied warranty, some facts support a conclusion that Glen Engelhard should have obtained a contractor's, if not a general contractor's license. One who should be licensed as a contractor should not escape liability under the warranty of habitability on the ground he is not a licensed contractor. Equity requires that to be done which ought to have been done. *Paullus v. Fowler*, 59 Wn.2d 204, 214, 367 P.2d 130 (1961); *Ketner Bros. v. Nichols*, 52 Wn.2d 353, 358, 324 P.2d 1093 (1958). One may not profit by one's own misconduct. *McAlpine v. Miller*, 51 Wn.2d 536, 541, 319 P.2d 1093 (1958).

RCW 18.27.010(1), a section of the contractor registration act, defines a "contractor" for purposes of state licensing as

> any person, firm, corporation, or other entity who or which, *in the pursuit of an independent business* undertakes to, or offers to undertake, or submits a bid to, construct, alter, repair, add to, subtract from, improve, develop, move, wreck, or demolish any building, highway, road, railroad, excavation or other structure, project, development, or improvement attached to real estate or to do any part thereof including the installation of carpeting or other floor covering, the erection of scaffolding or other

> structures or works in connection therewith, the installation or repair of roofing or siding, performing tree removal services, or cabinet or similar installation; *or, who, to do similar work upon his or her own property, employs members of more than one trade upon a single job or project or under a single building permit except as otherwise provided in this chapter.* "Contractor" also includes a consultant acting as a general contractor. "Contractor" *also includes any person*, firm, corporation, or other entity covered by this subsection, *whether or not registered as required under this chapter* or who are otherwise required to be registered or licensed by law, *who offer to sell their property without occupying or using the structures, projects, developments, or improvements for more than one year from the date the structure, project, development, or improvement was substantially completed or abandoned.*

(Emphasis added.) A person engaging in an isolated and single business venture is as subject to the provisions of the registration act as is a party engaging in the construction business on a regular and continuing basis. *Nw. Cascade Constr., Inc. v. Custom Component Structures, Inc.*, 83 Wn.2d 453, 460, 519 P.2d 1 (1974).

Glen Engelhard employed many subcontractors to perform work on his lot. Also, we know that Engelhard claimed the 625 Meadows Drive as his principal home for at least two years, but we do not know when he began to market the home for sale. The earnest money agreement entered by Peggy Montgomery did not demand closing until more than one year in the future. A jury could conclude that Engelhard marketed and offered to sell the Meadows Drive residence within one year of his occupying the home. A jury could also conclude Engelhard never occupied the home.

RCW 18.27.010(5) defines "general contractor" as

> a contractor whose business operations require the use of more than

25

one building trade or craft upon a single job or project or under a single building permit. A general contractor also includes one who superintends, or consults on, in whole or in part, work falling within the definition of a contractor.

Glen Engelhard hired more than one subcontractor to complete the Meadows Drive home under one building permit.

Under RCW 18.27.090(11), a contractor need not register if he is an "owner who contracts for a project with a registered contractor." Nevertheless, this exemption "does not apply to a person who performs the activities of a contractor for the purpose of leasing or selling improved property he or she has owned for less than twelve months." An ambiguity lies in this exemption. The exemption may not apply when the owner lacked intent to own the property more than one year, although circumstances later prevent the sale within the first year of ownership.

Engelhard told Dwight Montgomery he needed to use the home as a principal residence for at least two years, but Engelhard has not directly expressed how long he intended to own the Meadows Drive residence. Summary judgment is improper where intent is unclear. *Wash. Hydroculture, Inc. v. Payne*, 96 Wn.2d 322, 329, 635 P.2d 138 (1981). After a trial, the trier of fact could conclude that, assuming the need for a contractor's license is relevant, RCW 18.27.090(11) does not shield Glen Engelhard from registering as a contractor. Whether a contractor is exempt under RCW 18.27.090 is a question of fact. *Arctic Stone, Ltd. v. Dadvar*, 127 Wn. App. 789, 795, 112 P.3d 582

26

(2005).

## *Built for Sale*

The implied warranty of habitability only applies when the dwelling is built for purposes of sale by the builder-vendor. *Klos v. Gockel*, 87 Wn.2d at 570. No Washington decision further analyzes this element of the warranty. Nevertheless, this element is closely related to the rule that the home must be new. Facts show that, although Glen Engelhard used the home at least to a limited extent, he built the home with the intent of selling. Engelhard told Montgomery that instead of living in the home he might only receive his mail there in order to claim tax advantages. Engelhard's conversation with Dwight Montgomery about his sales plan, evidence that the lead opinion ignores when beholding the facts in a light favorable to Engelhard, particularly confirms an intent to sell, or at least raises the genuine issue of material fact necessary to preclude summary judgment at this stage.

## *New Home*

For purposes of warranty liability, the house purchased must be a new house. *Carlile v. Harbour Homes, Inc.*, 147 Wn. App. at 201. The case most on point for purposes of this element is *Klos v. Gockel*, 87 Wn.2d 567 (1976). Hilda Gockel's husband was a self-employed house builder. Hilda was active in the family business as bookkeeper, planner, and interior decorator. The Gockel's practice was to buy several lots in close proximity to each other, build on one lot, occupy the first house when

finished, remain long enough to complete houses on the remaining lots, and ultimately sell all of the houses. When Hilda Gockel's husband died, she continued with the contractor business on a restricted scale. She built three houses on Mercer Island, two of which were sold. She resided in the third house at the time of trial. Stephen and Lois Klos purchased the first of the three houses constructed, in which Gockel lived for eleven months. The house was small and built primarily to suit her personal needs and tastes, as opposed to one built for speculation. Gockel did not originally contemplate selling the house. During her occupancy, she suffered injuries by falling on the stairs and decided to sell the house and build a house on one level. After the sale to the Kloses, a portion of the slope below the rear wall of the house slid. The ground beneath the front patio settled causing cracks and an upending of the patio slabs.

Stephen and Lois Klos sued Hilda Gockel claiming that the implied warranty of habitability applied to the sale of the home. The trial court ruled in favor of the Kloses, but the Supreme Court reversed. On appeal, Gockel argued against a warranty on the grounds that she was not a commercial builder, the Kloses did not purchase a new home, and the home was inhabitable. The Supreme Court based its ruling on the grounds that the home was inhabitable and the sale was not commercial in nature. The court observed that it is not enough that the builder contemplated an eventual sale of the house. The court held that the sale must be fairly contemporaneous with completion and not interrupted by an intervening tenancy unless the builder-vendor created such an

28

intervening tenancy for the primary purpose of promoting the sale of the property. The court considered there to be a question of fact as to whether the home was new:

> It is true that for purposes of warranty liability, the house purchased must be a "new house", but this is a question of fact. The passage of time can always operate to cancel liability, but just how much time need pass varies with each case. The trial court made no findings regarding this particular aspect of the warranty. Since appellant's other assignments of error are meritorious, we find it unnecessary to decide if respondents were purchasers of a "new house".

*Klos v. Gockel*, 87 Wn.2d at 571.

A parallel foreign decision is *Duncan v. Schuster-Graham Homes, Inc.*, 194 Colo. 441, 578 P.2d 637 (1978), *overruled on other grounds by Homestake Enters., Inc. v. Oliver*, 817 P.2d 979, 982 (1991). James and Hannah Duncan sued Schuster-Graham Homes for breach of an implied warranty of habitability. The trial court denied the claim while ruling that the implied warranty did not apply because the Duncans did not purchase a new home. The Colorado Supreme Court reversed. Schuster-Graham built the house in question in 1968 and sold it as a new house to Pease later that year. After Pease complained of various defects in the house, Schuster-Graham repurchased it from him in 1969. Having concluded that a drainage problem caused the defects which led to Pease's complaints, Schuster-Graham, in an attempt to correct the drainage problem, installed a sub-terrain drain. In 1969, after being advised that the home had been occupied previously and had been reacquired by Schuster-Graham to make repairs, the Duncans purchased the house from Schuster-Graham. Shortly after the Duncans assumed

29

occupancy, various defects began to appear in the house. These included, among other problems, cracks in the basement floor and some walls, separation of certain walls from floors and ceilings, and separation of the fireplace and chimney from walls. The state high court considered the home new because the builder sold the home and the intervening owner did not cause the defects.

As in *Klos v. Gockel*, Peggy Montgomery's claim creates an issue of fact as to whether she purchased a new home. Although Glen Engelhard used the home to a limited extent before the sale to Montgomery, we do not know if he occupied the home as if the dwelling was his principal residence. In viewing the facts in a light most favorable to the moving party, the lead opinion ignores evidence from which a jury could conclude that Engelhard never actually resided in the Meadows Drive home. Even if he did, his intervening occupancy is immaterial since he built the home.

Assuming Glen Engelhard lived in the 625 Meadows Drive residence, he likely resided there longer than Hilda Gockel resided in the residence sold to Stephen and Lois Klos. Nevertheless, the *Klos* decision teaches that the amount of time needed to pass to cancel the warranty varies with each case.

The requirement of the warranty that the home be new is desirable in part because of damage that an intervening occupier could impose on the home. Since Engelhard intended to sell the home, he likely would have taken precautions not to damage the home. Engelhard marketed the home, but we are not shown any of the marketing

30

material. For all we know, Engelhard could have marketed the home as a new home.

The tenancy of Dwight and Lisa Montgomery came after Peggy Montgomery signed the earnest money agreement. Thus, the intervening tenancy of the son and daughter-in-law could be disregarded and even considered to be part and parcel of Peggy Montgomery's dwelling in the home. Glen Engelhard may have not allowed anyone other than Peggy Montgomery's relatives to possess the home between the date of the earnest money agreement and the closing of the sale.

### First Purchaser-Occupier or First Intended Occupant

Washington courts have worded this fourth element of the implied warranty of habitability in various terms. In several decisions, the courts have penned that the doctrine of implied warranty of habitability protects the first occupants of residential property. *Carlile v. Harbour Homes, Inc.*, 147 Wn. App. at 200 (2008). When a vendor-builder sells a new house to its "first intended occupant," he impliedly warrants that the foundations supporting it are firm and secure and that the house is structurally safe for the buyer's intended purpose of living in it. *Klos v. Gockel*, 87 Wn.2d at 568 (1976).

According to one decision, the plaintiff need not be the first occupant in order to benefit from the warranty, as long as she is the first purchaser. *Gay v. Cornwall*, 6 Wn. App. at 598 (1972). The warranty extends to the "first purchaser-occupant" of the house. *Gay v. Cornwall*, 6 Wn. App. 595, 494 P.2d 1371 (1972). Jean Gay purchased the home from a third party who never occupied the home but who had purchased the home from

31

the builder, Elmo Willougby. This court still ruled that the implied warranty attached to the sale.

In *Casavant v. Campopiano*, 114 R.I. 24, 327 A.2d 831 (1974), Remo Campopiano rented a new home he built to a couple who intended to purchase the house upon securing financing. Within a year after taking possession, the couple vacated the premises, and shortly thereafter Campopiano sold the house to Donat and Frances Casavant. The Casavants later discovered that the roof of the house sagged. An inspection disclosed that the roof construction was defective and that such condition constituted a threat to the safety of occupants.

On appeal from a trial court award of damages to the Casavants, Remo Campopiano argued no implied warranty attached to the sale because of the intervening occupancy by others. Thus, the dwelling was, at the time of transfer, not a new but a used home. The Rhode Island Supreme Court disagreed. The court observed that the warranty of habitability afforded protection to home buyers from the overreaching of knowledgeable builder-vendors. An intervening tenancy standing alone should not deprive the buyer of that protection. As the home builder, Campopiano was in a far better position to determine the condition of the structure of the roof than was the Casavants. The court believed the builder's argument might have merit if the intervening occupancy caused the defective condition of the roof or was of such extended duration as to make an application of the warranties unreasonable. In the absence of such findings,

32

the court considered the home "new" and the Casavants as the first occupiers. The court observed that Campopiano retained title to the premises for the purpose of selling the house.

There is no evidence that Dwight and Lisa Montgomery's intervening occupancy caused the water intrusion or mold. Engelhard kept title to the residence until Peggy Montgomery purchased the home. Peggy Montgomery was the first purchaser who occupied 625 Meadows Drive.

Glen Engelhard either was the builder of the home or had control over the builder. Peggy Montgomery had no input into the construction of the home. Therefore, Engelhard was in the better position to ensure that the home was properly constructed. He could have prevented the Montgomerys' nightmare and avoided damages of hundreds of thousands of dollars by paying a few more thousand dollars to prevent water intrusion into the home. To paraphrase our state high court, in a comparative standard of innocence and culpability, Engelhard, who initiated and controlled the construction of the home, is less innocent and more culpable than the wholly innocent and unsuspecting Peggy Montgomery. *House*, 76 Wn.2d at 435-36. Montgomery did not bargain for a porous, inhospitable, and uninhabitable abode.

## Concurring Opinion

The concurring opinion wishes to affirm the trial court's granting of summary judgment on the statute of repose. Such a ruling might be correct. Nevertheless, Glen

33

Engelhard did not assert this defense on appeal and Peggy Montgomery has not been granted an opportunity to address this defense. This court does not review issues not argued, briefed, or supported with citation to authority. RAP 10.3; *Valente v. Bailey*, 74 Wn.2d 857, 858, 447 P.2d 589 (1968); *Avellaneda v. State*, 167 Wn. App. 474, 485 n.5, 273 P.3d 477 (2012). This court should not raise new issues without first giving the parties the chance to brief them. RAP 12.1(b). We have not afforded the parties the opportunity to brief the statute of repose.

The concurring opinion reads: "As correctly acknowledged by the dissent, for Mr. Engelhard to be a builder-vendor, he must come within the definition of being a registered contractor." Concurrence at 2-3. This dissenting opinion does not acknowledge that Engelhard must be a registered contractor to be a builder-vendor. To the contrary, this dissenting opinion disowns the implied ruling of the lead opinion that a builder must be a registered contractor for his home to be subject to an implied warranty of habitability.

## CONCLUSION

The trial court improvidently granted Glen Engelhard summary judgment, dismissing Peggy Montgomery's claim under the implied warranty of habitability. I would remand the case to the superior court for further proceedings.

Fearing, J.

34